Filed 6/26/25

# CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION SEVEN

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY et al., | B330610 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 19STCP02100) |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents; | |
| CENTENNIAL FOUNDERS, LLC, et al., | |
| Real Parties in Interest and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell Beckloff, Judge. Affirmed.

---

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts I.D.-E. and II. in the Discussion.

Carstens, Black & Minteer, Douglas P. Carstens, Michelle N. Black, Sunjana S. Supekar, for Plaintiffs and Appellants.

Dawyn R. Harrison, County Counsel, Starr Coleman, Assistant County Counsel, and Andriy R. Pazuniak, Deputy County Counsel; The Sohagi Law Group, Margaret M. Sohagi and Nicole H. Gordon, for Defendants and Respondents.

Holland & Knight, Jennifer L. Hernandez, Bradley B. Brownlow and Emily M. Lieban, for Real Parties in Interest and Appellants Tejon Ranch Co., Centennial Founders, LLC; and Tejon Ranchcorp.

Matthew Gelfand and Allyson Richman for Californians for Homeownership as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Meyers Nave, Deborah J. Fox, Amrit S. Kulkarni and Margaret W. Rosequist for National Community Renaissance of California as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Strumwasser & Woocher, Beverly Grossman Palmer and Salvador E. Perez for Climate Resolve as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

———————————————

## INTRODUCTION

In 2019, the County of Los Angeles (County) approved the Centennial Specific Plan, an expansive development on 12,000 acres of land in the Antelope Valley (the Centennial project). The Centennial project was proposed by real parties in interest Tejon Ranch Company, Centennial Founders LLC, and Tejon

2

Ranchcorp (collectively, Tejon). The multi-year approval process was subject to the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.) Before approving the Centennial project, the County Board of Supervisors (Board) certified an environmental impact report (EIR) and adopted CEQA findings and a statement of overriding considerations pursuant to Public Resource Code section 21081, subdivisions (a) and (b).

Environmental groups challenged the County's approval of the Centennial project. The Center for Biological Diversity and the California Native Plant Society (collectively, the Center) filed a petition for a writ of mandate, as did another organization, Climate Resolve. The superior court ruled the County's approval of the Centennial project violated CEQA by (1) improperly relying on state cap-and-trade regulations to offset the estimated unmitigated greenhouse gas emissions of the project,[1] and (2) failing to analyze wildfire impacts beyond the project site. After extensive briefing following Climate Resolve's settlement with Tejon, the court ultimately entered a judgment in favor of the Center and issued a peremptory writ of mandate ordering the

---

[1] The California cap-and-trade program, as described further in the Discussion, seeks to reduce greenhouse gas emissions by "capping" the emissions of certain industrial facilities and fuel and power suppliers and permitting these entities to trade emission allowances and offset credits to comply with the cap. (See Health & Saf. Code, §§ 38562, 38570; Cal. Code Regs., tit. 17, §§ 95801-96022; *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 485; *Our Children's Earth Foundation v. State Air Resources Bd.* (2015) 234 Cal.App.4th 870, 876.)

3

County to decertify the EIR and set aside the Centennial project approvals.

Tejon appeals, arguing the EIR's discussion of greenhouse gas emissions and the cap-and-trade program, as well as the discussion of offsite wildfire risks were not misleading. It also challenges the superior court's authority to grant the Center's petition on the grounds briefed by Climate Resolve. The Center cross appeals from the superior court's denial of its petition on other grounds, arguing the EIR failed to: (1) adequately discuss the Centennial project's impacts on wildlife movement and habitat connectivity; (2) disclose or mitigate the project's harm to native vegetation; and (3) analyze any alternatives that would substantially lessen the project's adverse impacts.

In the published part of the opinion, we address Tejon's arguments regarding the EIR's discussion of greenhouse gas emissions and the cap-and-trade program and conclude the superior court did not err by ruling the EIR was prejudicially misleading. As we explain, the County failed to proceed in a manner required by law when it applied the cap-and-trade program to the Centennial project's estimated unmitigated greenhouse gas emissions, which minimized the project's environmental impact and rendered the EIR prejudicially misleading. The project itself is not a covered entity under the cap-and-trade program, and the CEQA Guidelines contain an additionality requirement which forecloses applying an energy provider's or fuel supplier's obligatory cap-and-trade compliance to offset the estimated greenhouse gas emissions of a land-use project. (See Guidelines for the Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, §§ 15000 et seq. (hereafter, Guidelines), § 15126.4, subd. (c)(3).)

4

In the nonpublished part of the opinion, we address Tejon's arguments relating to the EIR's discussion of offsite wildfire risks, Tejon's procedural challenges to the superior court's ruling, and the Center's cross-appeal arguments. We conclude the superior court did not err by ruling the EIR was prejudicially misleading based on the discussion of offsite wildfire risk, and that it did not abuse its discretion by allowing the Center to prevail based on arguments briefed by Climate Resolve. We further conclude the superior court did not err by rejecting the Center's arguments relating to wildlife, native vegetation, and alternatives to the project.

In sum, we conclude the County violated CEQA by approving the Centennial project, reject the arguments raised on the appeal and cross-appeal, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Centennial Project and the EIR*

The Centennial project seeks to develop approximately 12,323 acres of the historic Tejon Ranch in the Antelope Valley, south of Kern County. The site is surrounded by the Tehachapi Mountains to the north, the Antelope Valley to the east, the Liebre and San Gabriel Mountains of the Angeles National Forest to the south, and private vacant land and the Los Padres National Forest to the west. The site is approximately one mile east of Interstate 5 (I-5) and would be primarily served by State Route 138 (SR-138), which runs through the southern portion of the site.

The Centennial project would consist of 19,333 residential units on 40 percent of the site, with business, commercial, and industrial uses on another 15 percent, leaving 45 percent of the

5

site open space.  This would result in approximately 6,699 developed acres and 5,624 acres of open space.  As finally approved in 2019, the project is a smaller version of a larger scale development that Tejon originally proposed in 2003.  As originally proposed, the project was to include 7,847 developed acres and 3,829 acres of open space, with 22,998 residential units.

The County issued notices of preparation of an EIR in 2004 and 2015, and it issued a draft EIR (DEIR) for public comment in 2017.  The County released a final EIR for public comment in May 2018, followed by a consolidated final EIR (CFEIR) in November 2018 for Board certification.  The Board held its final hearing on the Centennial project in December 2018, and on April 30, 2019, it certified the EIR and adopted CEQA findings of fact and a statement of overriding considerations.  (See Pub. Resources Code, § 21081, subds. (a) and (b).)  The certified EIR incorporates both the DEIR and CFEIR.

B.    *The Center and Climate Resolve Challenge the County's Certification of the EIR*

In May 2019, the Center and Climate Resolve each filed a petition for a writ of mandate in the superior court, alleging the County's approval of the Centennial project violated CEQA and various planning and zoning laws, as noted below.[2]  The

---

[2]    The Center and Climate Resolve each styled their challenge as a "petition for writ of mandate," citing the code sections for administrative and traditional mandamus.  (Code Civ. Proc., §§ 1085, 1094.5.)  "A party may seek to set aside an administrative decision for failure to comply with CEQA by petitioning for either administrative mandamus (Code Civ. Proc.,

6

petitioners both sought to set aside the County's certification of the EIR, the findings of fact, and the statement of overriding considerations supporting the County's approval of the Centennial project.

The Center's petition alleged a wide range of CEQA violations, including failure to analyze adequately and/or mitigate aesthetic, recreational, and biological impacts; greenhouse gas emissions; noise impacts; transportation and traffic impacts; population and housing impacts; growth-inducing impacts; wildfire risk impacts; land use impacts; water quality impacts; air quality impacts; seismic impacts; water supply risks and impacts; and, separately, the failure to adequately analyze alternatives. It also alleged inconsistencies with land use policies in the County's General Plan, the Antelope Valley Area Plan (AVAP), and related ordinances. Climate Resolve's petition was

---

§ 1094.5) or traditional mandamus (*id.*, § 1085). A petition for administrative mandamus is appropriate when the party seeks review of a 'determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with [CEQA],' generally referred to as an 'adjudicatory' or 'quasi-judicial' decision. [Citations.] A petition for traditional mandamus is appropriate in all other actions brought 'to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA].'" (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566-567); see Pub. Resources Code, §§ 21168, 21168.5, 21168.7.) A "writ of mandamus may be denominated a writ of mandate." (Code Civ. Proc., § 1084.)

7

more limited in scope and primarily alleged inadequate analysis and mitigation of greenhouse gas emissions and wildfire risk.

C.   *The Superior Court Grants Climate Resolve's Petition and Rules, After Reconsideration, that the Center Prevailed on Its Petition on the Same Grounds*

In April 2021, the superior court issued a 62-page opinion addressing both petitions, with separate minute orders incorporating the opinion in each case.  The court granted Climate Resolve's petition on two grounds:  (1) the EIR's discussion of greenhouse gas emissions improperly relied on state cap-and-trade regulations to reduce greenhouse gas emissions impacts below the level of significance, and (2) the EIR failed to analyze off-site wildfire impacts beyond the Centennial project site.  The court rejected the arguments briefed by the Center, and initially denied the Center's petition in its entirety, without addressing the substantive effect of the Center's incorporation by reference of the successful arguments briefed by Climate Resolve. The superior court acknowledged that Climate Resolve's "arguments are incorporated by reference by the [Center]," but stated "[i]t is unclear how the [Center] may incorporate by reference arguments made in a separate action by a different party."

After several rounds of briefing on the Center's motion for reconsideration and a settlement between Climate Resolve and Tejon (both described more fully in the nonpublished part of the Discussion), the superior court entered judgment in favor of the Center based on its greenhouse gas and offsite wildfire risk rulings, and entered judgment in favor of the County "on the remaining claims and causes of action."  The court issued a

peremptory writ of mandate ordering the County to decertify the EIR; set aside the Centennial project approvals, CEQA findings, statement of overriding considerations and mitigation program; and suspend all project activity "that could result in an adverse change or alteration to the physical environment."

Tejon timely appealed, and the Center timely cross-appealed.

## DISCUSSION

### I. TEJON'S APPEAL

Tejon argues the EIR's analysis of greenhouse gas and wildfire impacts complied with CEQA. The County, the lead agency charged with complying with CEQA, does not appeal the superior court's rulings to the contrary. We conclude the superior court did not err.

A. *CEQA and the EIR Process*

"CEQA was enacted to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, those impacts; (3) require project changes through alternatives or mitigation measures when feasible; and (4) disclose the government's rationale for approving a project." (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 488 (*Protecting Our Water*); accord, *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184-1185 (*Union*); *Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2024) 105 Cal.App.5th 1143, 1155.) CEQA ensures "public agencies

9

will consider the environmental consequences of discretionary projects they propose to carry out or approve." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 488; see *County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 626-627 (*County of Butte*); see generally Guidelines, §§ 15000-15387.) "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 (*Vineyard*).)

"CEQA review is undertaken by a lead agency, defined as 'the *public agency* which has the principal responsibility for *carrying out* or approving a project which may have a significant effect upon the environment.' (Pub. Resources Code, § 21067)." (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 712 (*Eel River*); accord, *Union, supra,* 7 Cal.5th at p. 1185.) On projects subject to CEQA that may have a significant environmental impact, the lead agency must prepare and certify an EIR before approving or proceeding with the project. (See *County of Butte, supra,* 13 Cal.5th at p. 627; *Protecting Our Water, supra*, 10 Cal.5th at pp. 488-489; Pub. Resources Code, §§ 21080, subd. (d), 21100, subd. (a) [state agencies], 21151, subd. (a) [local agencies]; Guidelines, §§ 15002, subd. (k)(3), 15063, subd. (b)(1).)[3] Here, the County is the lead agency responsible for the Centennial project approval and EIR.

---

[3] Alternatively, "[i]f potentially significant environmental effects are discovered, but the project applicant agrees to changes that would avoid or mitigate them, the agency prepares a mitigated negative declaration (§ 21080, subd. (c)(2); CEQA

The EIR is known as "the heart of CEQA." (Guidelines, § 15003, subd. (a); accord, *Eel River*, *supra*, 3 Cal.5th at p. 713.) "Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Goleta Valley*).) "Ideally, an EIR serves 'to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided.'" (*County of Butte, supra,* 13 Cal.5th at p. 627, quoting Pub. Resources Code, § 21002.1, subd. (a).)

An EIR "must include a description of the proposed project and its environmental setting and discussions of (1) the possible environmental effects of the project, (2) feasible measures to mitigate any significant, adverse environmental effects of the project, (3) the comparative environmental effects of a range of reasonable alternatives to the proposed project, including a 'no project' alternative, and (4) the cumulative impact of the project's various environmental effects." (*County of Butte, supra,* 13 Cal.5th at p. 627; see Guidelines, §§ 15124, 15126, 15126.4, 15126.6, 15130.)

When an EIR identifies significant effects on the environment if a project is approved, the agency must make specific findings regarding potential mitigation measures or alternatives and their feasibility. (See Pub. Resources Code, § 21081, subd. (a).) "A 'mitigation measure' is a suggestion or change that would reduce or minimize significant adverse

Guidelines, § 15070, subd. (b)), which also ends CEQA review." (*Protecting Our Water, supra,* 10 Cal.5th at p. 489.)

11

impacts on the environment caused by the project as proposed." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 455; see Pub. Resources Code, § 21002; Guidelines, § 15126.4, subd. (a)(1).) "Mitigation measures are modifications of the proposed design and implementation of a project imposed by the lead agency to reduce the project's adverse environmental effects. If an EIR identifies significant environmental effects, CEQA requires the adoption of mitigation measures when 'it is feasible to do so.' (Pub. Resources Code, § 21002.1, subd. (b).)" (*County of Butte, supra,* 13 Cal.5th at p. 627; see Pub. Resources Code, § 21002.1, subd. (c); Guidelines, § 15364.)

CEQA findings are "required under [Public Resources Code] section 21081, subdivision (a), for each significant effect noted in the draft." (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 508 (*Sierra Club*).) Specifically, "the agency must find that the project's significant environmental effects have been mitigated or avoided [citation], that the measures necessary for mitigation 'are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency' [citation], and/or that 'specific economic, legal, social, technological, or other considerations' render mitigation 'infeasible.'" (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 350.) To move forward with the project where mitigation is infeasible, the lead agency must find that "'specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment.'" (*Ibid.*; accord, *County of Butte, supra,* 13 Cal.5th at p. 627*;* Pub. Resources Code, § 21081, subd. (b).) A statement of overriding

12

considerations "is required in CEQA approved projects to show that the Project's significant environmental effects have been identified, and avoided or mitigated, or that unmitigated effects will be outweighed by the Project's benefits." (*Sierra Club,* at p. 508; see Pub. Resources Code, §§ 21002, 21002.1, 21081; Guidelines, §§ 15091-15093.)

### B. *Standard of Review*

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case . . . is the same as the trial court's:  The appellate court reviews the agency's action, not the trial court's decision" to determine whether the agency prejudicially abused its discretion. (*Vineyard, supra,* 40 Cal.4th at p. 427; see *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 214-215 (*Newhall*); *Arcadians for Environmental Preservation v. City of Arcadia* (2023) 88 Cal.App.5th 418, 428.)  The agency abuses its discretion if it has not proceeded in a manner required by law or if its factual determinations or decision are not supported by substantial evidence.  (See Pub. Resources Code, § 21168.5; *Newhall,* at p. 215; *Vineyard,* at p. 427; *Western States Petroleum Association v. California Air Resources Board* (2025) 108 Cal.App.5th 938, 955.)  "'Noncompliance with substantive requirements of CEQA *or noncompliance with information disclosure provisions "which precludes relevant information from being presented to the public agency . . .* may constitute prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied

13

with those provisions." (§ 21005, subd. (a).)'" (*Sierra Club, supra,* 6 Cal.5th at p. 515.)

In reviewing an agency's decision for compliance with CEQA, we determine de novo whether the agency employed proper procedures, and we review the agency's factual findings and statement of overriding considerations for substantial evidence. (See *Sierra Club, supra,* 6 Cal.5th at p. 512; *Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 675; see also Guidelines, §§ 15091, subd. (b), 15093, subd. (b).) "In evaluating an EIR for CEQA compliance, . . . a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard, supra,* 40 Cal.4th at p. 435.) Thus, "'[w]hile we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.'" (*Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 944 (*Ebbetts Pass*).)

In interpreting the CEQA Guidelines, "the rules that govern interpretation of statutes also govern interpretation of administrative regulations." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1097-1098.) Thus, we start with the plain language of the Guidelines, "giving effect to its usual meaning and avoiding interpretations that render any language surplusage." (*Id.* at p. 1097.)

C. *Greenhouse Gas Emissions*

Tejon argues the EIR's discussion of greenhouse gas emissions complied with CEQA. In its briefing, Tejon argues the County was entitled to apply the cap-and-trade program to reduce the Centennial project's emissions under *Association of Irritated Residents v. Kern County Bd. of Supervisors* (2017) 17 Cal.App.5th 708 (*AIR*). Tejon further argues the EIR's emissions analysis was not misleading because the EIR otherwise complied with CEQA and did not claim "mitigation credit" for the emissions it asserted would be offset by the cap-and-trade program. The Center argues the Centennial project is not subject to the cap-and-trade program because it is not a "covered entity" under the applicable regulations (Cal. Code Regs., tit. 17, §§ 95801-96022), which by their terms apply to specified categories of industrial facilities and fuel and power suppliers. We conclude the County failed to proceed in a manner required by law when it applied the cap-and-trade program to the Centennial project's estimated unmitigated emissions, which minimized the project's environmental impact and rendered the EIR prejudicially misleading.

1. *Greenhouse Gas Emissions and CEQA*

The County's duty to assess the significance of impacts from a project's greenhouse gas emissions is governed by Guidelines section 15064.4. (See *Newhall, supra,* 62 Cal.4th at p. 217; see Pub. Resources Code, § 21083.05; *AIR, supra,* 17 Cal.App.5th at p. 733.) The "lead agency shall make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project." (Guidelines, § 15064.4,

15

subd. (a).) "In determining the significance of a project's greenhouse gas emissions, the lead agency should focus its analysis on the reasonably foreseeable incremental contribution of the project's emissions to the effects of climate change." (*Id.*, subd. (b).) The agency should consider "(1) The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting; [¶] (2) Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project"; and [¶] "(3) The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions." (*Id.*, subds. (b)(1)-(b)(3); see *AIR,* at pp. 733-734.)

"Given the reality of growth, some greenhouse gas emissions from new housing and commercial developments are inevitable. The critical CEQA question is the cumulative significance of a project's greenhouse gas emissions." (*Newhall, supra,* 62 Cal.4th at pp. 220-221.) For agencies evaluating the cumulative significance of a proposed development's greenhouse gas emissions, "potential pathways to compliance" under CEQA include: (1) determining "what level of reduction from business as usual a new land use development . . . must contribute in order to comply with statewide goals"; (2) assessing consistency with statewide goals by looking to compliance either with statewide regulatory programs designed to reduce greenhouse gas emissions or with (3) "geographically specific greenhouse gas emission reduction plans"; and (4) using "existing numerical thresholds of significance for greenhouse gas emissions," such as air quality management district definitions of significance. (*Id.* at pp. 229-230.)

"For significant greenhouse gas emissions effects, feasible mitigation measures may include: '(1) Measures in an existing plan or mitigation program for the reduction of emissions that are required as part of the lead agency's decision; [¶] (2) Reductions in emissions resulting from a project through implementation of project features, project design, or other measures . . . ; [¶] (3) Off-site measures, including offsets that are not otherwise required, to mitigate a project's emissions; [¶] (4) Measures that sequester greenhouse gases; [¶] [and] (5) In the case of the adoption of a plan, such as a general plan, long range development plan, or plans for the reduction of greenhouse gas emissions, mitigation may include the identification of specific measures that may be implemented on a project-by-project basis. Mitigation may also include the incorporation of specific measures or policies found in an adopted ordinance or regulation that reduces the cumulative effect of emissions.' (Guidelines, § 15126.4, subd. (c).)" (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 17 Cal.App.5th 413, 432-433 (*Cleveland*); accord, *League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 120.)

2. *The EIR's Discussion of Greenhouse Gas Emissions*

Section 5.21 of the EIR addressed the Centennial project's impacts on greenhouse gas emissions and mitigation measures. The EIR listed various quantified and nonquantified mitigation measures in section 5.21.7, including compliance with the cap-and-trade program, which it categorized as a nonquantified mitigation measure "expected to further reduce Project-related GHG emissions" beyond the quantified mitigation measures. The EIR calculated the project's remaining unmitigated greenhouse

17

gas emissions (after the implementation of "quantified reductions from project design features and mitigation measures"). These estimated unmitigated greenhouse gas emissions are listed by emissions source in Updated GHG Report Table 1 and Table 3.

The EIR analyzed the impact of the project's estimated emissions under two "thresholds of significance," Thresholds 21-1 and 21-2. These were taken from the County Environmental Checklist, which incorporates Guidelines Appendix G.[4] The County explained in the EIR and Findings that its threshold analysis incorporated two of the potential "pathways" to compliance from *Newhall*. (See *Newhall, supra,* 62 Cal.4th at pp. 229-230.) These pathways were: (1) compliance with regulatory programs designed to reduce greenhouse gas emissions and that contribute to the achievement of statewide climate goals, and (2) compliance with a local climate action plan or other geographically specific greenhouse gas emission reduction plans.

Pursuant to Threshold 21-1, a project has a significant impact if it would "[g]enerate greenhouse gas emissions, either

---

[4] "The concept of a 'threshold of significance' is defined in the Guidelines as 'identifiable quantitative, qualitative or performance level of a particular environmental effect, noncompliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant.'" (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 883; see Guidelines, § 15064.7, subd. (a).) "Appendix G, which is printed following Guidelines section 15387, is an environmental checklist that includes questions about various aspects of the environment." (*King & Gardiner,* at p. 883.)

18

directly or indirectly, that may have a significant impact on the environment." Using Threshold 21-1, the EIR represented the Centennial project was "consistent with" a wide range of regulatory programs designed to reduce greenhouse gas emissions, including the statewide cap-and-trade program. As relevant here, the EIR stated under a header titled "Cap and Trade Reductions" that "approximately 96 percent" of the project's estimated 157,642 metric tons of carbon dioxide per year in unmitigated greenhouse gas emissions "are covered by, and subject to, the purchase of emission allowances under the new, expanded state Cap and Trade Program." Citing the Court of Appeal's decision in *AIR,* the EIR asserted that cap-and-trade compliance by "upstream" fuel and energy suppliers would reduce to zero a range of estimated direct and indirect emissions from the Centennial project's "downstream" consumption of natural gas, electric power, and transportation fuels.

Specifically, Updated GHG Report Table 3 applies the cap-and-trade program to offset the project's estimated unmitigated greenhouse gas emissions in several categories. The table, as presented in the EIR's Updated GHG Report and reproduced in the Findings, shows net "Remaining Emissions After Cap-and-Trade-Offsets" at zero for each category deemed "subject to" the cap-and-trade program. These categories include electrical power, natural gas, and transportation fuels (e.g., gasoline). The table also represents that total estimated unmitigated greenhouse gas emissions for the Centennial project are reduced

from 157,642 to 6,834 metric tons of carbon dioxide per year when "cap-and-trade offsets" are applied.[5]

As stated, pursuant to Threshold 21-2, a project has a significant impact if it would conflict with an applicable plan, policy, or regulation adopted to reduce greenhouse gas emissions. Using Threshold 21-2, the EIR represented the Centennial project was consistent with two local climate action plans: the Los Angeles County Community Climate Action Plan and the South Coast Association of Governments Regional Transportation Plan/Sustainable Community Strategy (SCAG RTP/SCS).

After examining Thresholds 21-1 and 21-2, the EIR concluded that greenhouse gas emissions at the project level were "less than significant." That is, under Threshold 21-1 the Centennial project's potential to generate direct or indirect emissions that may have a significant effect on the environment was less than significant, and under Threshold 21-2 the potential to "conflict with an applicable plan, policy, or regulation adopted for the purpose of reducing the emissions of [greenhouse gases]" was also less than significant. The EIR further "conservatively determined" that the project's incremental contribution to climate change was "cumulatively considerable and this significant cumulative impact would be significant and unavoidable," even though the project satisfied multiple pathways to compliance. The EIR explained that because (a) "climate change is a global

---

[5] The identical table as it appears in Annotation 2 to section 5.21 of the EIR omits the word "Offsets" and the corresponding column is labeled "Remaining Emissions After Cap-and-Trade." Although Tejon suggests the version that omits the word "Offsets" is not misleading, we conclude the table is misleading for the reasons described below.

phenomenon and the significance of greenhouse gas emissions is inherently cumulative in nature[,]" and (b) the County lacks "jurisdictional control" over many greenhouse gas reduction measures, "the Project's impact related to GHG emissions is most appropriately considered on a cumulative level, not on a project level." (See *Newhall, supra,* 62 Cal.4th at p. 219 ["'With respect to climate change, an individual project's emissions will most likely not have any appreciable impact on the global problem by themselves, but they will contribute to the significant cumulative impact caused by greenhouse gas emissions from other sources around the globe. The question therefore becomes whether the project's incremental addition of greenhouse gases is "cumulatively considerable" in light of the global problem, and thus significant.'"].)

Similarly, the EIR's Mitigation Measures section 5.21.7 represented that "[t]he project complies with each applicable pathway" (i.e., regulatory compliance that contributes to statewide climate goals, and compliance with a local plan), "and thus has a less than significant impact at a project level." The EIR also concluded that "even with implementation of all reasonable and feasible mitigation measures"—i.e., all the quantified and nonquantified mitigation measures described in section 5.21.7—the Centennial project's cumulative "climate change impacts would remain significant and unavoidable."

Based on the EIR's representations, the County found there were "no feasible mitigation measures which will reduce this cumulative impact to a less than significant level." The County's statement of overriding considerations explained that "although the Project is consistent with" applicable local plans and state regulatory programs to reduce greenhouse gases, and "[d]espite

21

the implementation of all feasible and reasonable mitigation," the estimated unmitigated emissions generated by the project would still contribute 157,642 metric tons of carbon dioxide equivalent per year to the global inventory of greenhouse gases. Thus, in the global context of greenhouse gas emissions, the Centennial project's "environmental impact related to greenhouse gas emissions is considered to be cumulatively significant."

3.  *The County Prejudicially Abused Its Discretion by Applying the Cap-and-Trade Program to the Centennial Project Greenhouse Gas Emissions Analysis*

The superior court ruled the EIR's discussion of the impacts of the Centennial project's greenhouse gas emissions was misleading and that the County failed to proceed as required by law by improperly applying cap-and-trade "offsets" to reduce the estimated emissions from the Centennial project. The court found the EIR's discussion of greenhouse gas emissions misleading because "[t]he cap-and-trade program does not provide any reduction to the Project's GHG emissions," and "is not relevant to determining the significance of the Project's GHG emissions impacts." The court further determined the County failed to proceed as required by law by failing to consider other emissions mitigation measures and by improperly adopting a statement of overriding considerations. We independently consider whether the County prejudicially abused its discretion in analyzing the Centennial project's greenhouse gas emissions by failing to proceed in the manner required by CEQA. (See *Newhall, supra,* 62 Cal.4th at p. 218; see Pub. Resources Code, § 21168.5.)

22

a.  *Background:  California's cap-and-trade program*

The California Air Resources Board (CARB) implemented the state cap-and-trade program in 2011.  (Health & Saf. Code, §§ 38562, 38570; see Cal. Code Regs., tit. 17, §§ 95801-96022; *AIR, supra,* 17 Cal.App.5th at p. 734.)  The program's purpose is "'to reduce emissions of greenhouse gases' from sources covered by the program 'by applying an aggregate greenhouse gas allowance budget on covered entities and providing a trading mechanism for compliance instruments.'"  (*Our Children's Earth Foundation v. State Air Resources Bd.* (2015) 234 Cal.App.4th 870, 876 (*Our Children's Earth*); Cal. Code Regs., tit. 17, § 95801.)  CARB's cap-and-trade regulations "cap" the aggregate greenhouse gas emissions of specific categories of industrial facilities and suppliers that produce greenhouse gases, known as "covered entities."  The regulations also permit covered entities to trade emission allowances and offset credits to meet their compliance goals.  (*AIR, supra,* 17 Cal.App.5th at pp. 734-735; *Association of Irritated Residents v. State Air Resources Bd.* (2012) 206 Cal.App.4th 1487, 1498, fn. 6.)  Under this market-based approach, covered entities "may comply with the cap by purchasing [greenhouse gas] reductions that others achieve, called offsets," and they may bank or sell unused emission allowances to other covered entities that need them.  (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 485 (*Golden Door*).)  Allowances and offset credits are referred to as "compliance instruments."  (Cal. Code Regs., tit. 17, § 95802, subd. (a)(69).)

23

i. *Covered entities, emissions, and facilities*

"Covered entities" under the cap-and-trade program are defined by regulation. They include large industrial facilities such as refineries, electricity generating facilities, iron and steel production facilities, cement and glass production facilities, oil and gas production facilities, and other specified industrial facilities that have exceeded greenhouse gas emission thresholds for their industry.[6] (Cal. Code Regs., tit. 17, §§ 95811, subds. (a)-(b), 95812; see *Our Children's Earth, supra,* 234 Cal.App.4th at p. 876 ["Entities covered by the program are from a broad spectrum of industries, including electricity, natural gas and fuel suppliers, each of whom has previously reported [greenhouse gas] emissions that exceed a threshold established by the Board for that industry."].) "Emissions" under the cap-and-trade program are defined as "the release of greenhouse gases into the atmosphere from *sources and processes in a facility*, including from the combustion of transportation fuels." (Cal. Code Regs., tit. 17, § 95802, italics added.) A "facility" is "[a]ny physical property, plant, building, structure, source, or stationary equipment . . . that emits or may emit any greenhouse gas." (*Ibid.*) The cap-and-trade regulations expressly apply to emissions produced on site at such facilities. (See Cal. Code Regs., tit. 17, §§ 95802, 95811, 95812; 95852, subds. (a)-(b); see *AIR, supra,* 17 Cal.App.5th at p. 735 [describing such covered entities as "capped facilities"].)

---

[6] The cap-and-trade regulations also permit other entities to opt in to or voluntarily associate with the cap-and-trade program, under circumstances not at issue here. (See Cal. Code Regs., tit. 17, §§ 95813, 95814.)

24

Covered entities also include "suppliers" of fuels such as natural gas and transportation fuels. (Cal. Code Regs., tit. 17, §§ 95802 [defining "Fuel supplier" and "Natural gas supplier"]; 95811, subds. (c)-(g); see *Our Children's Earth, supra,* 234 Cal.App.4th at p. 876.) Fuel suppliers have compliance obligations based on the greenhouse gas emissions "that would result from full combustion or oxidation of the quantities of the fuels" they supply annually (rather than, e.g., based on emissions produced at a facility). (Cal. Code Regs., tit. 17, § 95812, subd. (d)(1); see §§ 95811, subds. (c)-(g), 95852, subds. (c)-(g).)

ii. *Offsets*

An "offset" is a term of art that refers to the verified removal or reduction of greenhouse gas emissions, which may then be traded among covered entities in the form of one "offset credit" per metric ton of carbon dioxide removed or reduced. Offsets are achieved via a CARB-approved "offset project" and quantified according to specific "offset protocols." (Cal. Code Regs., tit. 17, § 95802, subd. (a); *Golden Door, supra,* 50 Cal.App.5th at p. 485 [describing importance of the CARB protocols to cap-and-trade offsets].)

Greenhouse gas "offsets 'must be real, additional, quantifiable, permanent, verifiable, and enforceable.' (Cal. Code Regs., tit. 17, § 95802, subd. (a).)" (*Golden Door, supra,* 50 Cal.App.5th at p. 485.) The requirement that emissions reductions must be "additional" means that they must exceed "'any greenhouse gas emission reduction otherwise required by law or regulation, and any other greenhouse gas emission reduction that otherwise would occur.'" (Health & Saf. Code, § 38562, subd. (d)(2); see Cal. Code Regs., tit. 17, § 95802,

subd. (a); see *Yerba Buena Neighborhood Consortium, LLC v. Regents of University of California* (2023) 95 Cal.App.5th 779, 808.)  Accordingly, the methodology for calculating offset credits cannot "[r]esult in the crediting of air emissions that already have been identified as emission reductions necessary to achieve state and federal ambient air quality standards" or allow "double-counting emission reductions."  (Health & Saf. Code, § 39607.5, subd. (a)(3)(A), (C).)  "'Additionality is an important requirement because if non-additional (i.e., "business-as-usual") projects are eligible for carbon [offset] then the net amount of greenhouse gas emissions will continue to increase and the environmental integrity of carbon reduction projects will be called into question.'"  (*Golden Door*, at p. 514.)

b.  *The Centennial project is not a covered entity*

The Center argues the Centennial project is not subject to the cap-and-trade program because it is not a covered entity.  According to the Center, that means the EIR's representation that 96 percent of the Centennial project's emissions will be "offset" through cap-and-trade compliance is prejudicially misleading because the program does not authorize the offset of emissions by "downstream" users (i.e., retail users) of fossil fuels or electric power delivered by "upstream" covered entities (i.e., energy producers and suppliers).  We agree.  The project does not satisfy the definition of an energy producer or industrial facility (see Cal. Code Regs., tit. 17, §§ 95811, subds. (a)-(b), 95812), nor is it a fuel supplier (§ 95802).

The EIR relied on the Court of Appeal's decision in *AIR* to apply the cap-and-trade program to the Centennial project.  It represented that in *AIR*, "[c]ompliance with the Cap and Trade

26

program was upheld as a lawful CEQA mitigation measure to reduce GHG emissions to a less-than-significant level." Specifically, *AIR* affirmed the lead agency's use of cap-and-trade compliance in an EIR when the project site itself was a covered entity (an oil refinery), and the project (expansion of the refinery) would result in increased emissions from stationary sources at that facility.  (See *AIR, supra,* 17 Cal.App.5th at pp. 736, 741-744.)  The court examined whether the emissions associated with the project could be reduced based on the refinery's use of allowances and offset credits under the cap-and-trade program. (See *id.* at p. 739.)  The EIR in that case stated the refinery was a covered entity and projected the refinery's mandated cap-and-trade compliance would "counterbalance" the project's increased emissions.  (See *id.* at p. 736.)  *AIR* held the county properly considered the refinery's compliance with the cap-and-trade program in making its determination that the project's impact on emissions would be less than significant.  (*Id.* at pp. 718, 742-743.)  The court explained that "an inquiry into significance that is based on compliance with a program that sets limits and requirements for California's petroleum refining industry as a whole is a rational approach to regulating that industry's contribution to global climate change."  (*Id.* at p. 743.)

Here, the EIR and the Board's CEQA Findings state in great detail that, under *AIR,* compliance with the cap-and-trade program is an appropriate consideration for determining the impact of a project's greenhouse gas emissions is less than significant.  But, unlike the oil refinery in *AIR*, the Centennial project is not a covered entity under the cap-and-trade regulations and is not directly subject to compliance obligations under the cap-and-trade program.  The project is mixed-use and

27

primarily comprised of residential and commercial development. The project is also not part of a cap-and-trade-regulated "industry as a whole," as was the refinery in *AIR*. Rather, the project is merely supplied by electric power providers, natural gas suppliers, and fuel suppliers that are subject to the cap-and-trade program. As such, although the cap-and-trade program is a statewide regulatory program designed to reduce greenhouse gas emissions (*AIR, supra,* 17 Cal.App.5th at p. 743), because the Centennial project is not a covered entity under the cap-and-trade program, the program does not apply to emissions from this project.

### c. *The EIR's use of cap-and-trade "offsets" by energy and fuel suppliers*

The EIR's use of cap-and-trade "offsets" by energy and fuel suppliers in its analysis of the significance of the project's greenhouse gas emissions is contrary to law. CEQA does not contemplate applying cap-and-trade "offsets" to a project's greenhouse gas emissions based on its suppliers' cap-and-trade compliance when the project is not a covered entity. Applying cap-and-trade compliance to "offset" new project-related emissions runs counter to Guidelines section 15126.4, subdivision (c)(3), which provides that feasible "[o]ff-site measures . . . to mitigate a project's emissions" include "offsets *that are not otherwise required.*" (Guidelines, § 15126.4, subd. (c)(3), italics added.) Although this language appears to contemplate that a project may reduce its greenhouse gas emissions based on off-site offsets (see *Natural Resources Defense Council, Inc. v. City of Los Angeles* (2023) 98 Cal.App.5th 1176, 1211 (*NRDC*) ["'Generally speaking, CEQA permits mitigation

28

measures for GHG emissions to include offsite measures, including purchasing offsets,' where such measures incorporate procedures to ensure that the GHG reductions are quantified accurately."]), it expressly limits such offsets to those that are not "otherwise required" under existing laws or regulations. This is similar to the "additionality" requirement for offsets under the cap-and-trade program.

"Our reading is consistent with certain portions of administrative guidelines issued by the [California] Natural Resources Agency [CNRA], to whom we owe a measure of deference in a case such as this one."[7] (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 378 (*California Building Industry*).) We are guided by CNRA's 2009 Final Statement of Reasons addressing amendments to the CEQA Guidelines. (CNRA Final Statement of Reasons for Regulatory Action: Amendments to the State CEQA Guidelines Addressing Analysis and Mitigation of Greenhouse Gas Emissions Pursuant to SB 97 (Dec. 2009) <https://resources.ca.gov/CNRALegacyFiles/ceqa/docs/Final_Statement_of_Reasons.pdf> [as of June 25, 2025] (CNRA FSOR).)

CNRA explained that "[t]he offsets concept is familiar in other aspects of air quality regulation," where "laws generally require that emissions offsets must be 'surplus' or 'additional.'" (CNRA FSOR, at p. 48.) CNRA additionally explained it drafted Guidelines section 15126.4, subdivision (c)(3) in response to

---

[7] CNRA "is the agency with primary responsibility for statewide implementation of CEQA. It carries out this task in part by adopting administrative guidelines[,]" i.e., the CEQA Guidelines. (*California Building Industry, supra,* 62 Cal.4th at p. 378.)

"[c]omments . . . suggest[ing] that to be used for CEQA mitigation purposes, offsets should also be 'additional.'" (*Ibid*.) According to CNRA, "in the context of greenhouse gas emissions, emissions reductions that would occur without a project would not normally qualify as mitigation." (*Id.* at p. 88.) Rather, under CEQA, "greenhouse gas emission reductions that are otherwise required by law or regulation would appropriately be considered part of the existing baseline." (*Id.* at p. 89.)

CNRA further stated that "this interpretation . . . is consistent with the Legislature's directive" that emissions reductions under the cap-and-trade program "must be 'in addition to any greenhouse gas emission reduction otherwise required by law or regulation, and any other greenhouse gas emission reduction that otherwise would occur.'" (CNRA FSOR at pp. 88-89; see Health & Saf. Code, § 38562, subd. (d)(2); Cal. Code Regs., tit. 17, § 95802; *Golden Door, supra,* 50 Cal.App.5th at pp. 513-514.) Although the cap-and-trade program and CEQA are separate statutory and regulatory schemes, their additionality provisions each prohibit double counting of offsets.[8]

---

[8] The EIR stated in a footnote "that CEQA Guideline § 15126.4(c)(3) does expressly authorize lead agencies to rely on 'offsets that are not otherwise required' to mitigate the GHG impacts of a project." It represented that "[n]either the CEQA statute nor the CEQA Guidelines expressly require lead agencies to ensure 'additionality' when relying on GHG offsets as mitigation[,]" and that the cap-and-trade program's additionality provision in Health and Safety Code section 38562 "is not a provision of CEQA and it imposes no obligations on the Lead Agency with respect to its compliance with CEQA." The EIR further represented that, "[i]n any case, the Project does not rely on GHG offsets to mitigate the Project's impacts related to GHG

Here, the Guidelines's additionality requirement forecloses applying an energy provider's or fuel supplier's cap-and-trade compliance to offset the estimated emissions of a land use project under CEQA, such as the Centennial project.  If an energy provider or fuel supplier is subject to the cap-and-trade program, it is legally required to comply with the program.  Under Guidelines section 15126.4, subdivision (c)(3), an offset cannot be credited both to the covered entities' regulatory compliance and to the Centennial project's emissions because cap-and-trade offsets are offsets already "otherwise required" for that program—they provide no additional emissions reductions for the project.

> ### d. *CARB's letter supports that the cap-and-trade program does not apply here*

During the EIR process, CARB's executive officer submitted a comment letter stating:  "[T]he Cap-and-Trade Program simply does not cover the [Centennial] Project, or require it [to] do anything to mitigate its emissions. . . .  [T]he California State Legislature . . . did not intend for the Cap-and-Trade Program to mitigate emissions from land use projects."  CARB's letter noted that "the Legislature specifically provided

---

emissions not otherwise covered by California's cap-and trade program."  The EIR's suggestion that only offsets to emissions "not otherwise covered" by the cap-and-trade program would be subject to that Guideline is misleading and incorrect.  As we explain, Guidelines section 15126.4, subdivision (c)(3), only permits use of offsets "not otherwise required" by other programs, and offsets used for cap-and-trade compliance constitute offsets already "otherwise required" for that program.

31

that GHG reductions from the Cap-and-Trade Program would be 'in addition to any greenhouse gas emission reduction otherwise required by law or regulation, and any other greenhouse gas emission reduction that otherwise would occur.'" It also stated that the Legislature's separate statutory efforts to reduce transportation-related greenhouse gas emissions from land use developments further indicated that the cap-and-trade program was not intended to extend to such emissions.

Tejon raises several challenges to the CARB letter. First, it argues we should give CARB's letter no weight. The weight we ascribe to "an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7.) While an agency's "opinion letters are not controlling, they reflect the type of experience and considered judgment that may properly inform our judgment." (*Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 267 [DLSE opinion letters entitled to some interpretive weight]; but see *Heckart v. A-1 Self Storage, Inc.* (2018) 4 Cal.5th 749, 769, fn. 9 [advice letters written by Department of Insurance legal staff members "entitled to little weight"].) Here, as the chief executive of the state agency charged with regulating greenhouse gas emissions and implementing the cap-and-trade program, the CARB executive officer "is in a position to accumulate both knowledge and experience relevant to the administration" of the program. (*Augustus,* at p. 267.) We give the CARB comment letter and the CARB Statements of Reasons (discussed below) "some consideration" in our independent interpretation of the

regulations, "taking into account and respecting the agency's interpretation . . . whether embodied in a formal rule or less formal representation." (*Yamaha*, at pp. 7, 15.)

Next, Tejon selectively quotes from CARB's Initial Statement of Reasons (CARB ISOR) for the cap-and-trade program and in its opening brief argues that CARB's "official regulatory intent" was "that upstream electricity, natural gas, and fuel suppliers were included by CARB as covered entities under Cap-and-Trade for the express purpose of capping GHG emissions generated by downstream consumption of those fuels."[9] But CARB's Final Statement of Reasons (CARB FSOR) subsequently stated: "[C]ap-and-trade is not well-suited to address emissions from millions of distributed point sources such as automobiles. However, our approach is not to apply cap-and-trade to the end user (vehicle drivers), but to the fuel suppliers, who will be responsible for fuel that is combusted. By taking this 'upstream' approach in the regulation, we avoid the challenges of applying it to millions of 'downstream' users." (CARB FSOR, p. 178.) Thus, "[t]he cap-and-trade program addresses both facility emissions that occur from fuel production . . . and

---

[9] CARB's "'Final Statement of Reasons . . . ,' [is] a more than 2,000-page document summarizing the extensive evidence supporting the Board's decision to adopt the Cap-and-Trade program regulation." (*Our Children's Earth, supra,* 234 Cal.App.4th at p. 892.) It incorporates by reference the Initial Statement of Reasons. (See CARB, Final Statement of Reasons (Oct. 2011) (CARB FSOR); Initial Statement of Reasons (Oct. 2010) (CARB ISOR) at <https://www.arb.ca.gov/regact/2010/capandtrade10/capandtrade10.htm> [as of June 25, 2025].)

accounts for combustion emissions from the fuel that is produced and sold in California."  (*Ibid.*)

Third, Tejon argues that, notwithstanding CARB's letter, using cap-and-trade compliance by the Centennial project's "upstream" fuel and energy suppliers to reduce the project's emissions was appropriate because *AIR* authorized it.  This is similar to the County's stated rationale for rejecting CARB's letter.  Tejon contends that under *AIR*, "[t]he only relevant question here is whether the Project's electricity and fuel suppliers are covered entities that will be required to surrender compliance instruments to counterbalance the emission increases associated with the Project's electricity and fuel usage."

Tejon misreads *AIR*.  As stated, in *AIR* the project at issue involved a refinery, which is a covered entity under the cap-and-trade regulations.  Further, the court observed the EIR in that case stated the refinery's electrical provider (PG&E) was also a covered entity and that the EIR projected that PG&E's cap-and-trade compliance would offset indirect emissions increases at PG&E's facilities resulting from the refinery's increased power usage.  (See *AIR, supra,* 17 Cal.App.5th at pp. 735-736.)  But this was not part of the rationale for the court's holding.  Instead, *AIR*'s discussion of whether the EIR in that case correctly applied the cap-and-trade program to the refinery modification project's emissions focused solely on the refinery's "compliance with a program that sets limits and requirements for California's petroleum refining industry as a whole."  (*Id.* at pp. 741-744.)  "Based on this industry-wide perspective," the court concluded it was proper for the county to consider the refinery's compliance with the cap-and-trade program when assessing the impact of the

modification's project-specific greenhouse gas emissions. (*Id.* at p. 743.)

*AIR* did not address whether the EIR's application of the cap-and-trade program to offset the project's indirect emissions from increased energy use by its upstream power provider was correct. Accordingly, *AIR* does not support Tejon's argument and is not authority for the proposition that a land use development project, like the Centennial project, can include greenhouse gas emissions offsets by upstream energy providers in its analysis of a project's environmental impact under CEQA. Nor does *AIR* have any bearing on the application of cap-and-trade compliance to project-specific natural gas and transportation-related emissions. Although the EIR in *AIR* calculated a variety of transportation-related emissions from "mobile sources," such as onsite vehicles, rail, and truck transportation (*AIR, supra,* 17 Cal.App.5th at p. 736), it did not attempt to apply the cap-and-trade program to offset the project's emissions from transportation fuels. And the EIR in *AIR* did not represent that any emissions from combustion of non-transportation fuels were offset by upstream fuel suppliers' cap-and-trade compliance.

We conclude that for purposes of analyzing the Centennial project's compliance with applicable state regulatory programs and the significance of its greenhouse gas emissions impacts, the County did not proceed according to law when it applied the cap-and-trade program to the project.

e. *Tejon's additional arguments*

At oral argument, Tejon's counsel stated, "We don't ask this court to uphold the *Association of Irritated Residents* case." Tejon also conceded that Updated GHG Table 3 "is misleading, yes,"

and that "reading that table in isolation from everything else might have caused a little confusion." But Tejon argued, as it did in its opening brief, that the EIR was not misleading as a whole because Updated GHG Table 3 "never takes credit for GHG reductions under Cap-and-Trade; it only reports the amount of Project GHG emissions that are covered by Cap-and-Trade." In Tejon's view, because the EIR did not quantify the cap-and-trade program in the "mitigation measures" section, the application of the cap-and-trade program in Updated GHG Table 3 was merely a "disclosure item," not a "mitigation credit" under CEQA.[10] Tejon argued at oral argument that because the Board's CEQA Findings and statement of overriding considerations found that the project would still emit 157,642 metric tons of carbon dioxide per year, in its view, "no one was actually confused" by the representation that 96 percent of that estimated unmitigated emissions amount would be further reduced or offset by the cap-and-trade program.

As we shall explain, this contention is unpersuasive. Updated GHG Table 3 shows estimated unmitigated project emissions across several categories, with columns for "Amount Subject to Cap-and-Trade" and "Remaining Emissions After Cap-and-Trade-Offsets." For each category deemed "subject to" the

---

[10]    At oral argument, Tejon's counsel also argued that any error in the EIR's application of the cap-and-trade program could be severed under Public Resources Code section 21168.9 without fully decertifying the EIR or setting aside the project approvals. Tejon "did not include this argument or supporting reasoning in its briefs, and we decline to address an argument cursorily raised for the first time at oral argument." (*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.* (2018) 6 Cal.5th 59, 87, fn. 10.)

36

cap-and-trade program, the "Amount Subject to Cap-and-Trade" column shows a 100 percent reduction in total emissions for that category, resulting in a net amount of zero for "Remaining Emissions After Cap-and-Trade-Offsets." The EIR refers to the effect of the cap-and-trade program as "cap-and-trade offsets" or "cap-and-trade reductions" that would "cover" and reduce the remaining estimated unmitigated emissions by 96 percent. This table was preceded by a detailed analysis asserting the cap-and-trade program is a "lawful CEQA mitigation measure to reduce GHG emissions" and an appropriate consideration for determining the impact of a project's greenhouse gas emissions is less than significant.

A decisionmaker or member of the public would reasonably understand the EIR to represent that the cap-and-trade program would offset the project's remaining unmitigated greenhouse gas emissions to zero in those categories.[11] The CEQA Findings reflect that the Board in fact understood it this way in approving the EIR, stating: "The Project will emit GHGs at an estimated [rate] of 157,642 metric tons per year that will contribute to the global inventory of GHGs (although 96 percent of these emissions

---

[11] To the extent Tejon cites a version of the table with the final column heading "Remaining Emissions After Cap-and-Trade," omitting the word "Offsets," that presentation is still misleading. Whether expressly identified as an "offset" or not, a reasonable reading of the Updated GHG Report Table 3 is that application of the cap-and-trade-program reduces "remaining emissions" to zero in the subject categories. The version referencing "Cap-and-Trade-Offsets" was included in the EIR as part of the Updated GHG Report and was reproduced in the CEQA Findings adopted by the Board, indicating the Board relied on that version in certifying the EIR.

will be offset through the purchase of Cap and Trade emission allowances)." The Findings repeatedly represent that "96 percent (150,808 MTCO2e/yr)" of the project's estimated unmitigated emissions are "covered by, and subject to" the cap-and-trade program, and state that "[o]nly approximately 4 percent of the total emissions, or 6,834 MTCO2e/yr, . . . would not be subject to the purchase of emission allowances under the Cap-and-Trade program." But the cap-and-trade program does not apply to the Centennial project nor does it reduce its greenhouse gas emissions, and it is therefore irrelevant to determining the significance of the project's emissions.

That the effect of the cap-and-trade program was quantified in the EIR's analysis of the significance of the project's greenhouse gas emissions, rather than in the "mitigation measures" section, does not affect this conclusion. The cap-and-trade program is listed in Mitigation Measures section 5.21.7 among "[r]egulations that are not quantified inputs" into the project-specific mitigation analysis, "but should be considered for incorporation as appropriate." The EIR explained that these mitigation measures "indirectly support the implementation and management of the quantified measures or are expected to further reduce Project-related GHG emissions." The EIR's analysis of greenhouse gas emissions in section 5.21 and the Updated GHG Report likewise state that the cap-and-trade program "will further reduce Project-related GHG emissions," then proceed to quantify the program as described above, identifying the cap-and-trade program as an "offset" that would reduce the remaining unmitigated emissions by 96 percent. The EIR thus based its significance determination on the reduced emissions figure resulting from the erroneous application of the

38

cap-and-trade program.  Whether utilized as a quantified mitigation measure in the first instance or as a mitigation measure projected to "further reduce" the remaining unmitigated emissions, applying the cap-and-trade program in this way to the Centennial project was misleading and violates CEQA.

Tejon also argues that any error in the EIR's Threshold 21-1 analysis was not prejudicial.  (*See Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 490 [erroneous inclusion of alternative development design that did not further CEQA purposes was "not condone[d]" but not prejudicial].)  Specifically, Tejon argues the Centennial project's contribution to cumulative greenhouse gas impacts complied with the Los Angeles County Community Action Plan and RTP/SCS (under the EIR's Threshold 21-2 analysis).  In Tejon's view, the EIR concluded the project greenhouse gas emissions were "less than significant" under Guidelines section 15064.4 and the "local plan" pathway of *Newhall*.

Based on that argument, Tejon contends that compliance with any one "pathway" is sufficient under CEQA, and that the Centennial project has done its "fair share" to address the problem of climate change.  As one "potential pathway[]" to CEQA compliance, regional "greenhouse gas emission reduction plans" "may, if sufficiently detailed and adequately supported, be used in later project-specific CEQA documents to simplify the evaluation of the project's cumulative contribution to the effects of greenhouse gas emissions."  (*Newhall, supra,* 62 Cal.4th at pp. 229-230; see Guidelines, § 15183.5.)  "If a project is found to be consistent with the broad plan, that finding provides sufficient evidence for the agency to conclude the project has no significant

impact due to greenhouse gas emissions." (*McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 92.)

We reject Tejon's argument under the circumstances here. Each of the "potential pathways to compliance" "depend[s] on the circumstances of a given project," and there is no "guarantee that any of these approaches will be found to satisfy CEQA's demands as to any particular project." (*Newhall, supra,* 62 Cal.4th at p. 229.) That some of the EIR's greenhouse gas emissions analysis was adequate under CEQA does not mean that the EIR overall was not misleading or that decisionmakers and the public were not substantively misinformed as to the emissions reductions ascribed to the cap-and-trade program. (See *Banning Ranch Conservancy v. City of Newport Beach (*2017) 2 Cal.5th 918, 941-942 (*Banning Ranch*) ["however technically accurate" some portions of EIR may have been, a failure to accurately "account for related regulations" constituted prejudicial abuse of discretion, ""'regardless of whether a different outcome would have resulted if the public agency had complied with the law"'"].)

That the EIR's ultimate finding the project had cumulatively significant impacts to global climate change would remain unchanged without the EIR's flawed cap-and-trade analysis "does not excuse the EIR's failure to reasonably describe the nature and magnitude of the adverse effect." (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 514-515; see Guidelines, § 15151 ["An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences."].) The severity of the project's greenhouse gas emissions increase is not an "insignificant detail" (*We Advocate*

*Thorough Environmental Review v. County of Siskiyou* (2022)
78 Cal.App.5th 683, 694-696), and "simply labeling the effect
'significant' without accompanying analysis of the project's
impact . . . is inadequate to meet the environmental assessment
requirements of CEQA" (*Berkeley Keep Jets Over the Bay Com. v.
Board of Port Comrs.* (2001) 91 Cal.App.4th 1344, 1371 (*Berkeley
Keep Jets Over the Bay Com.*)).

"[I]naccurate minimization of the cumulative impacts" of a
project thwarts "meaningful assessment of the true scope" of a
project's environmental impacts and "cannot be dismissed as [a]
harmless or insignificant defect[]." (*Bakersfield Citizens for Local
Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1217,
1220-1221.) Rather, "the danger created by providing
understated information" is that it "subverts an agency's ability
to adopt appropriate and effective mitigation measures, skews its
perspective concerning the benefits of the particular projects
under consideration and precludes it from gaining a true
perspective on the consequences of approving the project." (*Id.* at
p. 1217; see *San Franciscans for Reasonable Growth v. City and
County of San Francisco* (1984) 151 Cal.App.3d 61, 77-79
[significant omission "renders an analysis of cumulative impacts
inaccurate and inadequate because the severity and significance
of the impacts will, perforce, be gravely understated. . . .
[¶] [¶] . . . [I]t is vitally important that an EIR avoid minimizing
the cumulative impacts."].)

*Berkeley Keep Jets Over the Bay Committee* is instructive.
There, the appellate court determined there were "substantial"
defects in the EIR's discussion of air contamination from an
airport project, where "[m]uch information of vital interest to the
decision makers and to the public pertaining to toxic air

41

contamination [TAC] was simply omitted.  In other instances, the information provided was either incomplete or misleading." (*Berkeley Keep Jets Over the Bay Com.*, *supra,* 91 Cal.App.4th at p. 1371.)  The appellate court rejected as "unpersuasive the Port's argument that the absence of a health risk assessment can be excused because the Port Commissioners, in approving the EIR, found that the effect of TACs would be significant but that overriding considerations warranted proceeding with the project anyway.  This approach has the process exactly backward and allows the lead agency to travel the legally impermissible easy road to CEQA compliance.  *Before* one brings about a potentially significant and irreversible change to the environment, an EIR must be prepared that sufficiently explores the significant environmental effects created by the project."  (*Ibid.*; see also *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1123 [EIR's finding that dust impacts would be significant and unavoidable, even with mitigation measures, was inadequate without detailed account of the impacts; "a more detailed analysis of how adverse the impact will be is required"].)

The Centennial project is a large land use development with cumulative climate change impacts the County found are "considerable," "significant and unavoidable."  Yet the EIR and the County's CEQA Findings also repeatedly represented that 96 percent of the Centennial project's estimated unmitigated emissions would be covered by the cap-and-trade program, and that "Cap-and-Trade-Offsets" would reduce "Remaining Emissions" to zero in a number of categories.  A decisionmaker or member of the public relying on the EIR would reasonably be led to believe that the project's significant unmitigated greenhouse

42

gas emissions would be offset almost entirely by the cap-and-trade program, minimizing and obscuring the severity of the project's significant cumulative impacts.

Under the circumstances, "[t]he public was deprived of a full understanding of the environmental issues raised" by the Centennial project proposal. (*Banning Ranch, supra,* 2 Cal.5th at p. 942.) The erroneous application of cap-and-trade "offsets" to the emissions analysis was an unavoidable and prejudicial component of the final EIR. Regardless of the project's compliance with the local climate action plans, the EIR would reasonably be read as representing that there was no need to mitigate further the project's greenhouse gas emissions.

4. *The EIR's Mitigation Discussion Is Also Prejudicially Flawed by the EIR's Reliance on the Cap-and-Trade Program*

We also conclude the EIR's mitigation discussion, including its reliance on "fair share" allocation, is inherently flawed by the EIR's reliance on the cap-and-trade program, which permeates the discussion. Once a significant environmental effect has been identified, "the EIR must propose and describe mitigation measures that will minimize the significant environmental effects that the EIR has identified." (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 360 (*Napa*); see Pub. Resources Code, § 21100, subd. (b)(3); CEQA Guidelines, § 15126, subd. (e).) Mitigation measures must be feasible and enforceable. (CEQA Guidelines, § 15126.4, subds. (a)(1)-(a)(2).) Whether the EIR's discussion of mitigation measures is sufficient and the EIR's discussion supports the adoption of the statement of overriding

43

considerations present mixed questions of law and fact generally subject to independent review.  (See *King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 866.)

Significantly, "[m]itigation measures must be consistent with all applicable constitutional requirements" including that "[t]he mitigation measure must be 'roughly proportional' to the impacts of the project."  (Guidelines, § 15126.4, subd. (a)(4)(B); accord, *Napa, supra*, 91 Cal.App.4th at p. 360; see *Dolan v. City of Tigard* (1994) 512 U.S. 374.)  This proportionality principle is known as "'fair share'" allocation.  (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 364 ["Under the Guidelines, 'a project's contribution to a significant cumulative impact' may properly be considered 'less than cumulatively considerable and thus . . . not significant' 'if the project is required to implement or fund its fair share of a mitigation measure or measures designed to alleviate the cumulative impact.'  (CEQA Guidelines, § 15130, subd. (a)(3).)"]; see *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 912.)

The CEQA Findings embraced fair share principles, stating that "single projects cannot be required to bear a greater than proportional share of mitigating a cumulative significant impact."  The County made the finding that it "determined that feasibility of the mitigation measures required for this project must be commensurate with a fair share allocation."  The County also summarized the emissions impact of the project as "emit[ting] GHGs at an estimated of 157,642 metric tons per year that will contribute to the global inventory of GHGs (although 96 percent of these emissions will be offset through the purchase of Cap and Trade emission allowances)."  The EIR then listed a variety of mitigation measures in section 5.21.7, including compliance with

the cap-and-trade program as described above. Tejon argues that "[s]ince the Project's GHG mitigation program would reduce Project emissions by 34,412 MTCO2e/yr, but the Project's 'uncapped' incremental contribution to the cumulative impact is just 6,834 MTCO2e/yr [after applying the cap-and-trade-program], [the] County reasonably determined that imposing yet more mitigation on the Project would exceed the Project's 'fair share' and require double mitigation of 'capped' emissions, thereby violating Guidelines sections 15041(a) and 15126.4(a)(4)(B)."

The superior court determined the EIR's mitigation discussion, including its reliance on a fair share rationale, was "flawed" because it contemplated further reduced emissions from the cap-and-trade program. And because the EIR's mitigation discussion was flawed, the court also ruled the County improperly adopted a statement of overriding considerations. We agree. Although the parties dispute whether the EIR adequately evaluated the feasibility of other mitigation measures, our "task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 (*Laurel Heights*); accord, *Ebbetts Pass, supra,* 43 Cal.4th at p. 944.) Rather, we conclude that by its nature, the County's improper reliance on the cap-and-trade program that permeated the EIR and its Findings "resulted in inadequate evaluation

45

of . . . mitigation measures." (*Banning Ranch, supra,* 2 Cal.5th at p. 942.)

The unavoidable prejudice of applying the cap-and-trade program to offset the Centennial project's projected emissions also rendered the adoption of a statement of overriding considerations improper. A statement of overriding considerations is intended to demonstrate the balance struck by the lead agency in weighing the "benefits, of a proposed project against its unavoidable environmental risks." (Guidelines, § 15093, subds. (a), (c).) An override decision must accurately demonstrate the balance struck in approving the project. (See *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 983.) Thus, a statement of overriding considerations supported by a legally flawed analysis, or legally flawed assessment of the potential environmental harm, is not able to accurately "show that the Project's significant environmental effects have been identified, and avoided or mitigated, or that unmitigated effects will be outweighed by the Project's benefits." (*Sierra Club, supra,* 6 Cal.5th at p. 508; see *Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1222 [a statement of overriding considerations that relies on a legally flawed EIR is also legally flawed].) And, as discussed above, the argument that an EIR's misleading analysis or omission may be excused because the lead agency found an environmental effect significant but that overriding considerations warranted proceeding with the project anyway "has the process exactly backward . . . . *Before* one brings about a potentially significant and irreversible change to the environment, an EIR must be prepared that sufficiently explores the significant environmental effects created by the project."

46

(*Berkeley Keep Jets Over the Bay Com.*, *supra,* 91 Cal.App.4th at p. 1371.)

### D.    *Off-site Wildfire Risk*

The superior court determined "the EIR's conclusion wildfire risk impacts outside of the Project site will be reduced to less than significant is not supported by any analysis," and that the County failed to proceed as required by law when it did not analyze wildfire risk impacts beyond the project site.  The court also ruled that "[a]lternatively, to the extent the County believes it did analyze such impacts, the County's failure to explain its conclusion that fuel modification zones and [Mitigation Measure] 3-9 will reduce off-site wildfire risk impacts to less than significant is a failure to proceed as required by law."  Tejon argues the EIR adequately analyzed the Centennial project's wildfire risk impacts, including off-site impacts.  The Center contends the EIR's analysis disregards the extreme fire threat surrounding the project site, including risks from off-site project features, such as the expansion of electrical power and natural gas infrastructure, and contains only a single inadequate paragraph discussing off-site risk impacts.  We agree.

#### 1.    *Regulatory Background and Standard of Review*

The County's duty to assess the significance of a project's impact on the environment, including wildfire risk, is governed by Guidelines section 15126.2, subdivision (a).  The Guideline provides, in relevant part: "[a]n EIR shall identify and focus on the significant effects of the proposed project on the environment. . . .  The discussion should include relevant specifics of the area . . . .  The EIR shall also analyze any

47

significant environmental effects the project might cause or risk exacerbating by bringing development and people into the area affected.  For example, the EIR should evaluate any potentially significant direct, indirect, or cumulative environmental impacts of locating development in areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas), including both short-term and long-term conditions." (Guidelines, § 15126.2, subd. (a).)

"[A] sufficient discussion of significant impacts requires not merely a determination of whether an impact is significant, but some effort to explain the nature and magnitude of the impact." (*Sierra Club, supra,* 6 Cal.5th at p. 519.)  "When reviewing whether a discussion is sufficient to satisfy CEQA, a court must be satisfied that the EIR . . . includes sufficient detail to enable those who did not participate in its preparation to understand and to consider meaningfully the issues the proposed project raises."  (*Id.* at p. 510; see *Laurel Heights, supra,* 47 Cal.3d at p. 405.)

Assertions that an EIR's discussion is inadequate "do[] not fit neatly within the procedural/factual paradigm," but "the adequacy of an EIR's discussion of environmental impacts is an issue distinct from the extent to which the agency is correct in its determination whether the impacts are significant."  (*Sierra Club*, *supra,* 6 Cal.5th at pp. 513-514.)  We review claims of inadequate discussion de novo unless the agency's discussion of significant project impacts implicates a factual question.  (*See id.* at p. 514 ["[W]hether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of the impact is not a substantial evidence question.  A conclusory discussion of an environmental impact that an EIR deems

48

significant can be determined by a court to be inadequate as an informational document without reference to substantial evidence."].) "Whether or not the alleged inadequacy is the complete omission of a required discussion or a patently inadequate one-paragraph discussion devoid of analysis, the reviewing court must decide whether the EIR serves its purpose as an informational document." (*Id.* at p. 516.)

Tejon contends the superior court incorrectly applied de novo review to its analysis of whether the EIR's discussion of fire impacts were sufficient. Tejon claims the adequacy of the EIR's discussion of fire risk impacts is a "factual dispute over 'whether adverse effects have been mitigated'" (*Vineyard, supra,* 40 Cal.4th at p. 435) subject to substantial evidence review. We conclude de novo review is appropriate because the Center's challenge to the EIR's discussion does not turn on whether there was substantial evidence for the no significant impact determination, but rather on whether the EIR's perfunctory discussion of off-site wildfire impacts contains sufficient analysis.

2.    *The EIR's Analysis of Wildfire Risk Impacts*

EIR section 5.3.3 addresses "wildland fire hazards that could occur in the vicinity of the Project site." The discussion purported to analyze direct and indirect impacts on fire safety "for each threshold criterion for both the on-site and off-site Project features."

"Off-site project features" are "Project features that occur outside the limits of the Project boundary." The off-site project features of the Centennial project are described in detail in EIR section 4.7. These include roadway improvements as well as utility connections and improvements to existing off-site systems,

49

including extension of electrical transmission lines, electrical substation upgrades, construction of natural gas lines, construction of a natural gas regulator station, extension of telephone lines, new groundwater wells and water pipelines, and construction of an "electrical generation and distribution system" as part of a multi-purpose utility corridor.

The EIR disclosed the Centennial project site lies within a Very High Fire Hazard Severity Zone (VHFHSZ) and High Fire Hazard Severity Zone (HFHSZ) under criteria established by the California Department of Forestry and Fire Protection (CAL FIRE) and the County.  These zones "are subject to high fire hazards due to the presence of high brush, woodlands, and steep slopes."  CAL FIRE documented a total of 31 wildfires over 100 acres in size within five miles of the Centennial project site from 1964 to 2015, four of which occurred within project boundaries.  The EIR acknowledged the area is "highly vulnerable" to fires; the Centennial project "would introduce urban development in an undeveloped area subject to wildfire hazards"; the Centennial project would "substantially increase the likelihood of [fire] incidents"; and, the "potential for wildland fire hazards would still exist at the wildland/urban interface" after development of the site.

The EIR adopted two thresholds relating to fire safety impacts, derived from the County Environmental Checklist. Threshold 3-8 assesses whether the project would "[e]xpose people or structures to a significant risk of loss, injury, or death involving fires, because the project is located:  [¶] i. within a Very High Fire Hazard Severity Zone . . . .  [¶] ii. within a high fire hazard area with inadequate access.  [¶] iii. within an area with inadequate water and pressure to meet fire flow standards.

[¶] iv. within proximity to land uses that have the potential for dangerous fire hazard." Threshold 3-9 assesses whether the proposed use "constitute[s] a potentially dangerous fire hazard."

With regard to on-site impacts (not at issue in this appeal), the EIR conducted a detailed four-page analysis of the threshold criteria. It concluded the Centennial project would expose people or structures to a significant risk of loss, injury, or death involving fires. The EIR described how the Fuel Modification Plan required by Mitigation Measure 3-9 (MM 3-9) would apply to developed areas and the wildland/urban interface zone near undeveloped areas of the site to provide protection from wildfires, through vegetation "buffer zones."[12]

By contrast, a separately titled section for "Off-Site Impacts" stated in full: "The off-site Project features (intersections with SR-138, utility connections, water wells, and California Aqueduct crossings) would not include land uses that would, by themselves, increase the risk of fire hazards. With Project implementation, adequate access, adequate water pressures and flows, and fuel modification would be provided on

---

[12] MM 3-9 provides: "The Project Applicant/Developer shall prepare a Fuel Modification Plan demonstrating compliance with the County Fire Code Title 32 and shall provide all new residents and business owners with recorded Covenants, Conditions, and Restrictions (CC&Rs) or disclosure statements that identify the responsibilities for maintaining the fuel modification zone(s) on their property, as defined in the approved Fuel Modification Plan. The CC&Rs or disclosure statements prepared by the Project Applicant/Developer shall be submitted to the County [of Los Angeles] to confirm that new property owners will be informed of their responsibilities for maintaining the fuel modification zone(s) on their property."

51

the site and would either include the locations of off-site features or support the adequate water pressures and flows (i.e., water wells and infrastructure in 300th Street West). These features do not represent dangerous fire hazards, nor would they be located proximate to a fire hazard. There would be no impact and no mitigation is required."

The County concluded that overall wildfire hazard impacts for on- and off-site project features would be reduced to "less than significant" with adherence to requirements for fuel modification zone management, emergency access, and construction. It identified MM 3-9 as the applicable mitigation measure and stated: "Impacts related to fire hazards would be less than significant with implementation of MM 3-9."

### 3. *Adequacy of the EIR's Discussion of Off-site Wildfire Risk Impacts*

We conclude the EIR's one-paragraph discussion fails to adequately analyze off-site wildfire risk impacts. The Centennial project's off-site project features are substantial, including construction of major new intersections with SR-138 and expansion and new construction of utility lines and facilities. Some of the proposed off-site project features provide alternative options, including two different options to increase electricity capacity to serve the project, by reconfiguring or upgrading nearby Southern California Edison (SCE) substations and/or overhead transmission lines "to handle the higher load."[13]

---

[13] The EIR explains: "To provide adequate capacity for electrical services for the Project, SCE would select one of the following two options to implement: (1) reconfigure the Bailey

The Center argues that wildfires have been linked to electrical power lines and infrastructure, and mitigation measures such as undergrounding of power lines or shutting off power during dry and windy conditions were proposed during the EIR process. Yet the EIR concludes there are no dangerous fire hazards from off-site project features without any substantive discussion. There is no analysis in the EIR that supports its determination that the extensive off-site project features—including electrical transmission and distribution lines, electrical facilities, and natural gas infrastructure—"do not represent dangerous fire hazards," "would not include land uses that would, by themselves, increase the risk of fire hazards," and do not require mitigation. In short, the discussion lacks any connection between each threshold criterion and the County's ultimate conclusion that there is "no impact and no mitigation is required" for the off-site project features.

Nor does the EIR's conclusory assertion that "adequate access, adequate water pressures and flows, and fuel modification would be provided on the site and would either include the locations of off-site features or support the adequate water pressures and flows" provide an adequate discussion of mitigation. Instead, the discussion is "merely a determination" without explanation. (*Sierra Club, supra,* 6 Cal.5th at p. 519.) At most, the EIR's phrasing suggests that the off-site project

Substation or (2) upgrade the Gorman Substation and retrofit the existing overhead power lines. An electrical generation and distribution system shall be constructed as part of the main utility corridors for dry utilities. The timing of construction, as well as specific facility location and sizing, shall be coordinated with SCE."

53

features will have adequate emergency access and water supply that meets fire flow standards, and that fuel modification measures might extend to the locations of off-site features, presumably under MM 3-9 (as Tejon argues). But the discussion does not provide specifics, or any analytical link to how the on-site fuel modification plan required by MM 3-9 would apply to the various types of off-site features or operate to reduce off-site risks. MM 3-9 itself provides only that "new residents and business owners" and "new property owners" would have responsibility for maintaining fuel modification zones on their property, with no obvious application to off-site project features or utilities. CEQA requires a "reasonable effort to discuss relevant specifics regarding the connection between two segments of information already contained in the EIR." (*Sierra Club,* at p. 521.) Such effort is absent here.[14]

To the extent Tejon argues in its appellate briefs that various fire reduction measures described elsewhere in the EIR should apply to the analysis of off-site impacts and mitigation, when "[c]ontained in a brief, such explanation is directed at the wrong audience. The relevant informational document here is the EIR, and the EIR must communicate not to the reviewing court, but 'the public and the government officials deciding on the

---

[14] Tejon also asserts that the EIR's adequate analysis of offsite wildfire risks is shown by its five-page response to a comment regarding wildfire risk impacts on the Angeles National Forest. That response primarily focused on how on-site project features and services would reduce fire risk impacts and improve "access to fire protection and emergency services" on and around the project site. It does not, however, specifically address or connect that discussion to direct and indirect impacts on fire safety of the off-site project features.

project.'" (*Sierra Club, supra,* 6 Cal.5th at pp. 520-521; see *Vineyard, supra,* 40 Cal.4th at p. 443 ["That a party's briefs to the court may explain or supplement matters that are obscure or incomplete in the EIR . . . is irrelevant . . . . The question is . . . not whether the project's significant environmental effects *can* be clearly explained, but whether they *were.*"].) Here, the section on off-site fire risks did not cross-reference other areas of the EIR describing fire reduction measures in any clearly explained way.

Tejon argues that a reviewing court's CEQA analysis "'do[es] not require technical perfection or scientific certainty,'" quoting *Sierra Club, supra,* 6 Cal.5th at page 515. But the EIR's "patently inadequate one-paragraph discussion" (*id.* at p. 516) does not contain "sufficient detail to enable those who did not participate in its preparation to understand and to consider meaningfully the issues the proposed project raises." (*Id.* at p. 510; see *Laurel Heights, supra,* 47 Cal.3d at p. 405.)

E.     *Tejon's Procedural Challenges*

Tejon raises a number of procedural challenges relating to the superior court's ruling allowing the Center to prevail on Climate Resolve's briefing and on the effect of Tejon's settlement with Climate Resolve. We conclude the arguments lack merit.

1.     *Additional Procedural Background*

As stated, the Center and the Climate Resolve each filed separate actions against the County and Tejon. The Center and Climate Resolve also filed a notice of related case with regard to the two actions. (See Cal. Rules of Court, rule 3.300(a).) They each indicated the cases "involve[] the same parties and [are] based on the same or similar claims," and were likely "to require

55

substantial duplication of judicial resources if heard by different judges."

Tejon filed a response to the notices of related case, joined by the County, agreeing the cases were related and assignment to the same judge would conserve resources, "as there are overlapping factual and legal issues between the cases." Tejon stated: "Specifically, the petitioners in both cases challenge the adequacy of the County's analysis of greenhouse gas and fire hazard impacts. Both cases seek substantially similar relief."

The superior court ordered the cases related and assigned them to the same judge with a single schedule of hearings. The superior court asked the parties (the Center, Climate Resolve, the County, and Tejon) to confer regarding ways to reduce repetition of facts, law, and argument.

The parties conferred and agreed on a stipulation and proposed order, which was entered by the court. The parties stipulated to a coordinated briefing schedule and agreed the Center would prepare a single administrative record and single statement of facts in its opening brief, "which will be incorporated by reference into Petitioner Climate Resolve's Opening Brief." The parties further agreed "to separate issues to be discussed in each of their briefs so as to avoid overlap of arguments," and "request[ed] that the Court issue separate decisions and enter separate judgments in the two related cases."

The stipulation acknowledged the Center's petition was broader than Climate Resolve's because the Center "challenge[d] the EIR's analysis of 13 separate resource areas, as well as other alleged CEQA issues, and allege[d] that the Project is inconsistent with numerous County goals and policies, whereas Petitioner Climate Resolve challenges only the EIR's analysis of

56

greenhouse gases and fire hazards and alleges inconsistency with only two County policies."

The Center filed an opening brief with a comprehensive statement of facts that included greenhouse gas emissions and wildfire impacts. The Center's brief argued the Centennial project violated CEQA and planning and zoning laws on a variety of bases, including inadequate analysis and mitigation of various biological resources and failure to analyze any alternatives designed to reduce the project's adverse impacts. The Center's brief also stated it "join[ed] and incorporate[d] by reference the greenhouse gas and fire arguments raised in the Opening Brief filed by Climate Resolve."

Climate Resolve filed an opening brief arguing the EIR had inadequate analysis and mitigation of greenhouse gas and wildfire impacts. It stated it incorporated by reference the statement of facts and land-use arguments in the Center's brief.

Tejon filed two separate opposition briefs opposing the petitions. The County filed an opposition brief to the Center's opening brief, and a summary opposition brief joining in Tejon's opposition to Climate Resolve's opening brief. The County and Tejon did not object to the petitioners' incorporation by reference of each other's arguments, and incorporated portions of each other's briefs and arguments into their own briefs.

Climate Resolve filed a reply brief stating it "incorporate[d] by reference land-use claims brought in the [Center's] case." The Center filed a reply brief stating it "join[ed] and incorporate[d] by reference the arguments about the EIR's inadequate analysis and mitigation of greenhouse gas and wildfire impacts contained in Climate Resolve's Reply Brief."

The court ruled in favor of Climate Resolve based on the greenhouse gas and wildfire issues, and against the Center based on all issues it raised (including greenhouse gas and wildfire). The Center filed a motion for reconsideration, asking that its petition for writ of mandate be granted, or in the alternative, that the court grant the Center a new trial limited to greenhouse gas and wildfire issues. The Center argued that it alleged greenhouse gas and wildfire issues in its petition and raised them in the administrative process, the parties stipulated to coordinate briefing to avoid duplication of shared issues, and Climate Resolve and the Center incorporated by reference each other's arguments and collaborated on their legal briefs.

Tejon and the County opposed, arguing the Center abandoned its greenhouse gas and wildfire challenges by not briefing them, the Center spent little focus on those issues during the administrative process and litigation, and no authority supported a party joining another's briefs in a separate case. Tejon and the County also argued the Center "failed to identify any new or different facts, circumstances, or law warranting reconsideration under Code of Civil Procedure 1008."

The Center filed a reply arguing that Tejon and the County relied on each other's briefs and did not previously object to any party doing so, and that the Center never abandoned its longstanding concerns about climate change and wildfire impacts. The Center requested the court "exercise its discretion" and "use its powers of case management and administration" to grant the Center's petition or to permit the Center to brief those issues.

While the Center's motion was pending, Tejon and Climate Resolve reached a settlement, and Climate Resolve moved for

58

dismissal of its petition with prejudice.  The Center and the County were not parties to the settlement or involved in settlement negotiations.

On December 1, 2021, the superior court heard argument on the Center's motion for reconsideration.  At the hearing, the court stated its tentative ruling was that the Center had joined in Climate Resolve's arguments "such that the judgment in the Center [] case would include prevailing on the greenhouse gas and fire issues."  The court explained that despite there being two case numbers, "the practical reality is that we treated the cases as one" and "for all practical purposes, the court consolidated the matter."  In light of the parties' stipulation, the single administrative record, a "trial where all of the issues were resolved," and the joint order, the court stated, "I think everybody agrees that there was one set of issues and each party was joining in those issues."  The court observed that Tejon's response to the notice of related cases "indicated that specifically the petitioners in both cases challenge the adequacy of the county's analysis of greenhouse gas and fire hazard."  The court noted Tejon's response also included "a sentence about both cases seeking substantially similar relief," and that assignment to a single judge "will likely conserve judicial resources as there are overlapping factual and legal issues between the cases."  Also, Tejon's response brief to the Center's opening brief did not include greenhouse gas or fire issues among a list of claims Tejon argued the Center had abandoned by not adequately raising.

Tejon and the County argued that although the briefs were coordinated, the cases were not formally consolidated, the petitioners' arguments were made separately, and the court entered separate decisions for each case.  The County argued the

59

stipulation did not address how to handle overlapping arguments. Tejon further argued its settlement with Climate Resolve and the pending dismissal rendered that case "nonexistent," and that it had not had the opportunity to raise res judicata. The Center argued that it had not seen the settlement or been included in discussions. The Center asked the court to consider that "under CEQA, the remedy isn't necessarily a private settlement agreement with one of the litigants. . . . [U]nder CEQA, . . . we should have an opportunity to have a hearing on the remedy . . . because under CEQA it's about poor decision-making and public participation in the process, not necessarily kind of a private agreement."

The court stated that "maybe on my own motion or based on this motion," the Center should be allowed to present the greenhouse gas and fire issues, and that given how the cases had been litigated, it was "appropriate that the joinder be granted." The court continued the hearing and asked the parties to meet and confer regarding whether the settlement or another remedy might satisfy the Center.

On December 3, 2021, the court granted Climate Resolve's request for dismissal with prejudice. The remaining parties subsequently met and conferred twice. Tejon filed a 31-page report and brief stating the Center was not satisfied with the Climate Resolve settlement and still sought prevailing party status on the greenhouse gas and wildfire issues. Tejon further argued reconsideration should be denied because the Center could not revive "abandoned" claims; any relief was precluded by res judicata due to the dismissal of Climate Resolve's case; and that, if the court granted the motion for reconsideration, any remedy should be less than a full rescission of the Centennial

60

project approvals.  The County filed a report concurring with Tejon.  The Center's report stated the Climate Resolve settlement did not ameliorate its concerns about the Centennial project or the County's evaluation of greenhouse gas and fire issues.

On January 14, 2022, the superior court held its second hearing on the motion for reconsideration and heard additional argument from the parties.  The court clarified it did not view the Center as "joining" Climate Resolve's case, but rather that the Center "incorporate[d] all of the arguments made by Climate Resolve, the related case, in its brief."  The court stated:  "[U]nder *Le Francois vs. Goel* [(2005) 35 Cal.4th 1094 (*Le Francois*)], I'm going to find that I made an error, that I should reconsider, and that I should deem the arguments made by Climate Resolve on greenhouse gas and fire as incorporated into the Center for Biological Diversity brief . . . .  [T]hose arguments would similarly carry the day as they did in Climate Resolve."  The court explained "it would be intellectually dishonest of me to proceed otherwise," and that the court was "at fault for not making it clear" at the hearing and in its April 2021 order that the Center had prevailed on the incorporated arguments.

In response to Tejon's res judicata argument, the court stated:  "I don't see it as reviving a dismissed case.  I see it as at the time of the hearing having incorporated arguments that were made in [Climate Resolve's] case and considered by the court."  "[I]t's really about may a party incorporate by reference and join arguments made in a companion lawsuit where the parties are aligned."  The court also noted, "it's not as if the [Center] didn't raise greenhouse gas or fire in its petition such that any incorporation would exceed the scope of that."  Thus, the court reiterated, "I am going to grant the motion pursuant to

61

*Le Francois vs. Goel*," which "will mean that [the Center] prevail[s] in the same way that Climate Resolve did on the greenhouse gas and fire issue."  "So that would mean that [the Center] prevail[s] on their petition in terms of their greenhouse gas and fire hazards analysis."  The court also stated that it "reconsidered . . . on my own motion."

On January 14, 2022, the court issued a minute order stating, "The Motion for Reconsideration filed by [the Center] on 04/19/2021 is Granted."  Tejon filed a motion for reconsideration, which the superior court denied.

### 2.  *Standard of Review*

"A trial court's ruling on a motion for reconsideration is reviewed under the abuse of discretion standard."  (*New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 212 (*New York Times*).)  We also review for abuse of discretion a superior court's procedural orders, including orders setting the briefing schedule and scope of issues to be briefed.  (See *Bull Field, LLC v. Merced Irrigation Dist.* (2022) 85 Cal.App.5th 442, 452-455.)  As the superior court noted and the parties agree, no rule of court or civil procedure addresses incorporation by reference of another party's trial briefs in cases ordered related by the superior court and assigned to the same trial judge.  "[A]bsent a rule precluding incorporation by reference," we review for abuse of discretion, rather than de novo, a superior court's decision whether to consider memoranda or materials incorporated by reference into a party's filings.  (*Roth v. Plikaytis* (2017) 15 Cal.App.5th 283, 291-292, fn. 7 (*Roth*) [rejecting de novo review and concluding superior court abused its discretion

62

by failing to consider separately filed materials incorporated by reference].)[15]

### 3. *The Superior Court Was Authorized To Reconsider Whether the Center Was a Prevailing Party*

As stated, the superior court initially denied the Center's petition in its entirety, then subsequently reconsidered its ruling and granted it on the same grounds argued in Climate Resolve's briefing. Tejon contends the court lacked jurisdiction to rule on the Center's motion for reconsideration because it did not present any "new or different facts, circumstances or law" under Code of Civil Procedure section 1008.[16] Section 1008 generally governs "reconsideration of court orders whether initiated by a party or the court itself." (*Gilberd v. AC Transit* (1995) 32 Cal.App.4th 1494, 1499; see *Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1278 ["section 1008 places strict jurisdictional limits on a litigant's ability to seek reconsideration of a prior ruling"].) A party's motion for reconsideration of an order must be "based upon new or different facts, circumstances, or law." (§ 1008, subd. (a).) Or, "[i]f a court at any time determines that there has been a change of law that warrants it to reconsider a prior order it entered, it may do so on its own motion and enter a different

---

[15] Tejon contends that whether the superior court properly determined the Center was a prevailing party is a legal question reviewed de novo, citing *Central Delta Water Agency v. Department of Water Resources* (2021) 69 Cal.App.5th 170, 212. *Central Delta* deals solely with whether a motion for attorney fees was untimely and is inapplicable here.

[16] All undesignated references are to the Code of Civil Procedure.

order."  (§ 1008, subd. (c); see *Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 769 (*Phillips*); *Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 107.)

The court, however, expressly stated it reconsidered its prior order on its own motion.  Section 1008 does not limit "the court's ability, on its own motion, to reconsider its prior interim orders so it may correct its own errors."  (*Le Francois, supra,* 35 Cal.4th at p. 1108; accord, *New York Times, supra,* 135 Cal.App.4th at p. 211.)  "Even without a change of law, a trial court has the inherent power to reconsider its prior rulings on its own motion at any time before entry of judgment."  (*State of California v. Superior Court (Flynn)* (2016) 4 Cal.App.5th 94, 100 (*State of California*); see *Le Francois*, at pp. 1098, 1107; *Phillips, supra,* 209 Cal.App.4th at p. 768.)

In *Le Francois*, the Supreme Court held that, although section 1008 "prohibit[s] a *party* from making renewed motions not based on new facts or law," it "do[es] not limit a *court's* ability to reconsider its previous interim orders on its own motion, as long as it gives the parties notice that it may do so and a reasonable opportunity to litigate the question."  (*Le Francois, supra,* 35 Cal.4th at pp. 1096-1097.)  The Court held it does "not matter whether the 'judge has an unprovoked flash of understanding in the middle of the night' [citation] or acts in response to a party's suggestion.  If a court believes one of its prior interim orders was erroneous, it should be able to correct that error no matter how it came to acquire that belief."  (*Id.* at p. 1108; see *Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1249 ["it is immaterial what may have triggered a trial court's insight that its . . . order might be erroneous"].)  Limiting a court's ability to correct its own rulings

64

"'would directly and materially impair and defeat the court's most basic functions, exercising its discretion to rule upon controversies between the parties and ensuring the orderly administration of justice.'" (*Le Francois*, at p. 1104, accord, *Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 840.)

"To be fair to the parties," the court "should inform the parties of [its] concern, solicit briefing, and hold a hearing." (*Le Francois, supra,* 35 Cal.4th at p. 1108.) The superior court adhered to this procedure. Here, the parties briefed whether the Center was a prevailing party, and Tejon in its opposition to the Center's motion for reconsideration raised its argument that the Center had abandoned its claims before the hearing on the motion. At the hearing, the superior court stated its tentative ruling and further stated it was reconsidering its denial of the Center's petition "maybe on my own motion." It then continued the hearing for over a month with directions for the parties to meet and confer. The court accepted additional briefing from Tejon before the second hearing, over the Center's objection, and reports from the Center and the County that reiterated their positions. It heard further argument at the second hearing. In light of this record, we conclude the parties had "a reasonable opportunity to litigate the question" of whether the Center was a prevailing party. (*Le Francois,* at pp. 1096-1097.)

Tejon does not argue it lacked notice, a reasonable opportunity to brief the question of the Center's prevailing party status, or a hearing. Instead, it argues that "the trial court lacked jurisdiction to consider [or grant] [the Center]'s defective motion." But, as stated, "the trial court's inherent authority to correct its errors applies even when the trial court was prompted

65

to reconsider its prior ruling by a motion filed in violation of section 1008." (*In re Marriage of Barthold* (2008) 158 Cal.App.4th 1301, 1303-1304 (*Barthold*); see *id.* at p. 1313 ["In our view, the California Constitution requires that in any case in which a trial judge reconsiders an erroneous order, and enters a new order that is substantively correct, the resulting ruling must be affirmed regardless of any procedural error committed along the way."]; *State of California, supra,* 4 Cal.App.5th at p. 100 ["""""Miscarriage of justice results where a court is unable to correct its own perceived legal errors."""""]; accord, *Kerns v. CSE Ins. Group* (2003) 106 Cal.App.4th 368, 388, fn. 18.)

That the court changed its mind after a deficient section 1008 motion does not affect this conclusion. "*Le Francois* simply requires that the trial court reconsider a prior ruling based on its own realization that the ruling was erroneous, and not based upon a determination that the motion to reconsider should itself be granted on its merits." (*Barthold, supra,* 158 Cal.App.4th at p. 1308 [rejecting argument that the court's correction of erroneous ruling was "prompted" by a motion for reconsideration]; see *Reliant Life Shares, LLC v. Cooper* (2023) 90 Cal.App.5th 14, 61 (*Reliant Life Shares*) ["even if [party]'s motion 'did not comport with the procedural requirements of Code of Civil Procedure section 1008,' . . . the trial court had the authority to correct its error on its own motion"].) The superior court stated three times at the second hearing that it was reconsidering on the basis of *Le Francois*, and emphasized that it "reconsidered . . . on my own motion, actually." The court did not abuse its discretion.

66

4. *The Superior Court Did Not Abuse Its Discretion by Permitting the Center To Incorporate by Reference the Arguments Briefed by Climate Resolve*

Tejon also challenges the superior court's order allowing the Center to incorporate by reference the greenhouse gas and wildfire arguments briefed by Climate Resolve in its related action. We discern no error.

a. *Superior courts have broad authority over management of related cases*

Two or more cases in the same superior court may be ordered "related" and assigned to the same judge where the parties and issues are the same and would require substantial duplication of judicial resources to resolve separately. (*Bravo v. Superior Court* (2007) 149 Cal.App.4th 1489, 1492; see Cal. Rules of Court, rule 3.300(a)[17].) Upon the filing of a notice of a related case, the superior court may order the cases related and assign them to a single judge. (See rule 3.300(h).) Designating two cases as related "allows the trial court to promote efficiency, to avoid duplicative effort, to combat judge-shopping, and to minimize the prospect of conflicting results. The trial court system relies on this mechanism to detect and to cure the problem of parallel litigation within its jurisdiction." (*Harris v. Rojas* (2021) 66 Cal.App.5th 817, 820.) Relation of cases shares

---

[17] Undesignated rule references are to the California Rules of Court.

67

the same purpose of efficiency as other procedures, such as consolidation and coordination.[18]

In cases that have been ordered related, a court has authority to order coordinated briefing, even absent a formal consolidation order. (See, e.g., *Friends of Bay Meadows v. City of San Mateo* (2007) 157 Cal.App.4th 1175, 1181 ["In light of the obvious overlap between the two actions, the trial court effected an informal consolidation by establishing a unified briefing schedule" in related cases.].) This is consistent with "the 'inherent powers of the court . . . to [e]nsure the orderly administration of justice.'" (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 266 (*Walker*); see *id.* at p. 267 ["courts have inherent authority to control their own calendars and dockets"]; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 (*Rutherford*) [courts have inherent power to control litigation before them].) Although some powers are set out by statute, the inherent powers of the courts are derived from the California Constitution, article VI, section 1, and are not confined by or dependent on statute. (See *Walker*, at p. 267.)

---

[18] Actions pending before the same court that involve a common question of law or fact may be ordered consolidated in part or for all purposes. (See § 1048; see also *Vaquero Energy, Inc. v. County of Kern* (2019) 42 Cal.App.5th 312, 322.) Noncomplex related cases pending in different superior courts may be formally coordinated in one court under § 403 and rule 3.500. (See rule 3.300(2)(B).) Complex related cases may be coordinated subject to rule 3.501 et seq., with a "great breadth of discretion" granted to judges overseeing coordinated proceedings. (*McGhan Medical Corp. v. Superior Court* (1992) 11 Cal.App.4th 804, 812, 814; accord, *Pabla v. Superior Court* (2023) 90 Cal.App.5th 599, 603.)

68

b.     *The superior court had authority to allow the Center to incorporate by reference Climate Resolve's arguments*

Although Tejon incorporated by reference parts of the County's briefing, Tejon argues the court erred by allowing the Center to incorporate by reference Climate Resolve's greenhouse gas and wildfire arguments.

The cases here were related and filed under different case numbers, and the court did not formally coordinate or consolidate them, but Tejon has not given a persuasive reason why the superior court lacked the inherent authority to allow petitioners to incorporate parts of each other's briefing given the complexity of the case and duplicative nature of the arguments.  (See *Walker, supra,* 53 Cal.3d at p. 267; *Rutherford, supra,* 16 Cal.4th at p. 967; cf. *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300, fn. 5 ["'standard practice' permits parties to join in each other's arguments" in the same case]; *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1028, fn. 3, 1079, fn. 30 [in coordinated CEQA cases, allowing incorporation by reference of arguments briefed by other petitioners with separate case numbers].)  Indeed, as stated, in the superior court Tejon and the County incorporated by reference arguments in each other's briefs as well.[19]

---

[19]     Tejon and the County did the same in their appellate briefing.  Of course, in the courts of appeal, a party may "join in or adopt by reference all or part of a brief in the same or a related appeal."  (Rule 8.200(a)(5).)  The rule's primary purpose is "'to expedite briefing in multiparty appeals.'"  (*California Assn. of Retail Tobacconists v. State of California* (2003) 109 Cal.App.4th 792, 836, fn. 28; see *State of California ex rel. Rapier v. Encino*

69

We reject Tejon's argument the superior court erred under the circumstances presented. First, the Center expressly pleaded in its petition that the County violated CEQA because of the EIR's discussion of greenhouse gas and wildfire impacts, so Tejon was on notice the Center intended to raise these arguments. Second, Tejon acknowledged in its response to the notice of related cases that "the petitioners in both cases challenge the adequacy of the County's analysis of greenhouse gas and fire hazard impacts," and present "overlapping factual and legal issues between the cases."

Third, the parties filed a stipulation, which the court signed, stating that the Center and Climate Resolve would brief separate issues "so as to avoid overlap of arguments." Pursuant to that stipulation, the Center expressly incorporated Climate Resolve's arguments by reference in its merits briefing.[20] The Center's opening brief clearly stated it "join[ed] and incorporate[d] by reference the greenhouse gas and fire arguments raised in the Opening Brief filed by Climate Resolve," and Climate Resolve in turn clearly incorporated the Center's land-use arguments. The reply briefs reiterated this mutual incorporation of arguments, with the Center stating it "join[ed] and incorporate[d] by reference the arguments about the EIR's inadequate analysis and mitigation of greenhouse gas and

---

*Hospital Medical Center* (2022) 87 Cal.App.5th 811, 827.) That a similar rule does not exist in the rules of court governing procedures in the superior courts does not mean these courts lack the authority to allow a party to incorporate another party's arguments by reference.

[20] Relatedly, the Center's statement of facts was adopted by Climate Resolve.

70

wildfire impacts contained in Climate Resolve's Reply Brief."
Finally, Tejon had an opportunity to oppose the greenhouse gas
and wildfire arguments on the merits (and did so), and Tejon does
not explain why it would matter to its substantive opposition that
one of the petitioners briefed the arguments instead of the other.

Additionally, here the related cases were briefed and heard
concurrently by the same judge, and all parties embraced
incorporation by reference in the briefs—at least until the
superior court's merits order.[21]  Nothing precluded the superior
court presiding over two related cases from coordinating and
streamlining briefing of the issues.  In the absence of a statute or
rule disallowing incorporation by reference, the Center was not
required to separately brief the incorporated arguments.  (See
*Roth, supra,* 15 Cal.App.5th at pp. 291-292.)  And the court was
within its discretion to rule the Center prevailed on its petition
on these bases.  (Cf. *Reliant Life Shares, supra,* 90 Cal.App.5th at
p. 34 [in bifurcated trial, court had discretion to decide
allegations in separate pleading incorporated by reference];
*Park v. NMSI, Inc.* (2023) 96 Cal.App.5th 346, 360-361 [court did
not err in considering previously-filed material incorporated by
reference into application for writ of attachment where governing
statute "does not preclude incorporation by reference"].)

In short, "[t]he trial court in the instant case was satisfied
to read the [arguments] by reference.  We, too, are likewise

---

[21]     Tejon and the County did not object in the trial court to the
petitioners' use of incorporation by reference before the April
2021 order making Climate Resolve a prevailing party.  The
Center does not contend that Tejon's right to challenge
incorporation by reference on appeal was forfeited by failure to
object before the court's April 2021 order.

71

satisfied with [t]his ruling." (*Turney v. Collins* (1941) 48 Cal.App.2d 381, 388.)

5. *Claim and Issue Preclusion Do Not Apply*

Tejon argues its settlement with Climate Resolve and the dismissal of Climate Resolve's case with prejudice barred the Center from asserting the greenhouse gas and wildfire arguments under res judicata (claim preclusion) and collateral estoppel (issue preclusion) principles.[22] The doctrine of claim preclusion bars a party from relitigating a claim or entire cause of action previously decided by a court. (See *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 91 (*Kim*); *Samara v. Matar* (2018) 5 Cal.5th 322, 326-327.) "Issue preclusion, by contrast, prevents 'relitigation of previously decided issues,' rather than causes of action as a whole." (*Samara,* at p. 327.) "Claim and issue preclusion have different requirements. We have described claim preclusion as applying 'only when "a second suit involves (1) the same cause of action (2) *between the same parties [or their privies]* (3) after a final judgment on the merits in the first suit."' [Citation.] Issue preclusion, by contrast, 'applies only "(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) *asserted against one who was a party in the first suit or one in privity with that party*."'" (*Grande v. Eisenhower Medical Center* (2022) 13 Cal.5th 313, 323

---

[22] To avoid confusion, we follow the California Supreme Court "and use the terms 'claim preclusion' to describe the primary aspect of the res judicata doctrine and 'issue preclusion' to encompass the notion of collateral estoppel." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.)

(*Grande*).)  We focus our inquiry on whether Climate Resolve and the Center were in privity for purposes of claim and issue preclusion.[23]

      "'[P]rivity' is not merely a term that describes a close relationship between two entities; it implies that a judgment against one could have been used against the other, even though that entity was not a party to the judgment."  (*Grande, supra,* 13 Cal.5th at pp. 324-325.)  Privity does not exist if the first party "did not adequately represent the [second party]'s interests in the first action."  (*Id.* at p. 325.)  "'[T]he determination of privity depends upon the fairness of binding [the second party] with the result obtained in earlier proceedings in which it did not participate,'" and ""'requires close examination of the circumstances of each case."'"  (*Citizens for Open Access to Sand and Tide, Inc. v. Seadrift Association* (1998) 60 Cal.App.4th 1053, 1070 (*COA*); accord, *Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 229 (*PCL*).)  Privity is a legal issue we review de novo.  (See *COA,* at p. 1070.)

      Tejon argues Climate Resolve and the Center are in privity because they are organizations representing the public interest,

---

[23]    Here, the causes of action for violation of CEQA are the same, and the issues are essentially identical because the Center prevailed by incorporating by reference Climate Resolve's arguments, which were decided by the court before dismissing Climate Resolve's petition.  Further, "[a] dismissal with prejudice following a settlement constitutes a final judgment on the merits. . . . 'Dismissal with prejudice is determinative of the issues in the action and precludes the dismissing party from litigating those issues again.'"  (*Estate of Redfield* (2011) 193 Cal.App.4th 1526, 1533; accord, *Kim, supra,* 9 Cal.5th at p. 91.)  The parties largely agree with these propositions.

73

and the Center should be bound by the dismissal of Climate Resolve's claims. "[T]he common objective of representing the public interest in a lead agency's compliance with CEQA" may be sufficient to establish privity between two parties bringing CEQA challenges. (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 299, fn. 10 (*Silverado Modjeska*); accord, *Central Delta Water Agency v. Department of Water Resources* (2021) 69 Cal.App.5th 170, 209 (*Central Delta*) ["litigation of CEQA claims against a defendant on behalf of the public is generally sufficient" to establish "common interest in the enforcement of CEQA"].)

Here, Climate Resolve and the Center both "undertook [their] action[s] on behalf of the public," and "the key question regarding privity is whether [Climate Resolve] adequately acted as [the Center]'s "'virtual representative'"" in reaching the final settlement in its case. (*PCL, supra,* 180 Cal.App.4th at p. 230; see *COA, supra,* 60 Cal.App.4th at p. 1070 [a party "is adequately represented for purposes of the privity rule 'if his or her interests are so similar to a party's interest that the latter was the former's virtual representative in the earlier action'"].) "[T]he dispositive question is whether [Climate Resolve] asserted the common interest with adequate vigor." (*PCL,* at p. 230.) In examining this question, we look to "the manner in which [Climate Resolve] conducted and resolved its action." (*Ibid.* [no privity where one of three public interest groups voluntarily dismissed its CEQA action with prejudice due to lack of resources].)

We first examine "the public interests that CEQA seeks to promote." (Cf. *Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal.App.5th 380, 398 [because "CEQA is designed to further public interests," evaluation of how public interest

74

would be affected by an injunction requires identifying the underlying interests of CEQA enforcement].)  "CEQA was enacted to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, those impacts; (3) require project changes through alternatives or mitigation measures when feasible; and (4) disclose the government's rationale for approving a project." (*Protecting Our Water, supra,* 10 Cal.5th at p. 488; accord, *Union, supra,* 7 Cal.5th at pp. 1184-1185; see Guidelines, § 15091.)

"'If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action . . . .' [Citation.]  The EIR 'protects not only the environment but also informed self-government.'" (*Sierra Club, supra,* 6 Cal.5th at pp. 511-512.) "'The purpose of CEQA is . . . to compel government at all levels to make decisions with environmental consequences in mind.'" (*Laurel Heights, supra,* 47 Cal.3d at p. 393.)  Accordingly, "[i]n a CEQA proceeding, a plaintiff's right to ensure the lead agency's compliance with CEQA's substantive and procedural requirements with respect to a particular environmental impact is a primary right." (*Central Delta, supra,* 69 Cal.App.5th at p. 207; see *Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1204 ["The primary right in both proceedings is the right to ensure the city's compliance with CEQA's substantive and procedural requirements."])

Tejon argues the Climate Resolve settlement adequately represents the public interest because it "secured millions of dollars in sustained funding for green infrastructure and regional wildfire protection programs that directly benefit the public

75

interest." Tejon further contends counsel for Climate Resolve told the superior court the settlement is a "great result in the real world" which will "result in no [greenhouse gas] impact, not just insignificant [greenhouse gas] impact," and that although the settlement could not change the EIR's inadequate wildfire analysis, the settlement funds would "reduce the fire risks as much as we can." The Center counters that although the settlement purports to provide for greenhouse gas mitigation, "it does not provide the analysis or mitigation for wildfire risks omitted from the EIR," "fails to provide County decisionmakers with the analysis needed to have made the fully informed decision CEQA requires," and "does not provide the County with a meaningful oversight role." "Thus, the settlement fails to rectify the errors detailed in the rulings granting the Petitions." The Center further argues the settlement does not bind the County, the public entity that violated CEQA, and that Tejon has no statutory duty to abide by CEQA.

We conclude Climate Resolve did not adequately represent the Center's interests or the petitioners' common interest in CEQA enforcement with sufficient vigor to be deemed the Center's "virtual representative." (*PCL, supra,* 180 Cal.App.4th at p. 230.) The superior court ruled the EIR's discussions of greenhouse gas and offsite wildfire impacts were deficient. These rulings go squarely to the public information and disclosure interests of CEQA, and reflect the petitioners' successful pursuit of the "common objective" of "representing the public interest in a lead agency's compliance with CEQA." (*Silverado Modjeska, supra,* 197 Cal.App.4th at p. 299, fn. 10.) But despite the petitioners' close alignment in obtaining this ruling, their interests thereafter diverged.

76

Climate Resolve negotiated and settled with Tejon for millions of dollars in environmental incentives and wildfire safety projects and an array of substantive development measures, but it abandoned pressing the County to comply with CEQA. The Center was not included in the settlement discussions and did not see the settlement until after Climate Resolve's case was dismissed. Further, Climate Resolve had little incentive to represent the Center's interests in negotiations. Indeed, one of the settlement's terms was that Climate Resolve would actively support Tejon and the County in the Center's suit and would "oppose with oral advocacy and in court filings" the Center's ability to attain prevailing party status.

Tejon argues this case is like *COA*, where the court held a public interest group was bound by a settlement reached by several government agencies in a beach access dispute, even though the group was not a party to the settlement, and there was no "indication in the record of a direct interest of [the group] in the current dispute that was unrepresented by the state agencies in the prior litigation." (*COA, supra,* 60 Cal.App.4th at p. 1073; see *id.* at 1070 ["[the group], along with the public as a whole, was adequately represented by the state agencies vested with authority to litigate the issue of public access" to the beach].) *COA* is distinguishable because it involved a settlement by governmental agencies charged with protecting the public interest, rather than private parties. Further, the state agencies that negotiated the settlement consistently "asserted the same interests" as the public interest group, "seem to have been equally motivated to reach a successful conclusion of the litigation on behalf of the public," and "determine[d] the same matter of public interest." (*Id.* at pp. 1072-1073.) Unlike in

*COA*, the circumstances here indicate that the Center's interest in ensuring the County's compliance with CEQA—by obtaining a judgment setting aside approval of the project, decertifying the EIR, and requiring preparation of a new EIR adequately discussing and mitigating the impacts—were not adequately represented by Climate Resolve.

We do not question the environmental significance of Climate Resolve's settlement. We only determine that Climate Resolve and the Center were not in privity for purposes of claim preclusion or issue preclusion. We acknowledge that, "[i]f the common objective of representing the public interest in a lead agency's compliance with CEQA were not sufficient to establish privity between two parties for purposes of res judicata, the lead agency's compliance with CEQA would be subject to continuing challenges by different parties successively asserting similar claims, in contravention of the legislative goal of avoiding delay and achieving prompt resolution of CEQA claims." (*Silverado Modjeska, supra,* 197 Cal.App.4th at p. 299, fn. 10.) Here, of course, the County was not a party to the settlement. Further, on the facts presented, we conclude that when the lead agency's compliance with CEQA ceases to be a common objective, one environmental group's settlement with the developer and dismissal of its action against the lead agency does not foreclose another group from obtaining the relief already granted by the court.

## II.   THE CENTER'S CROSS-APPEAL

The Center cross-appeals from the superior court's denial of its petition asserting the EIR's discussion of impacts on wildlife

and native plant life was inadequate.  We conclude the superior
court did not err.

A.    *Governing Law and Standard of Review*

An EIR must identify and discuss "[a]ll significant effects
on the environment" of a proposed project.  (Pub. Resources Code,
§ 21100, subd. (b)(1); Guidelines, § 15126(a).)  A significant
environmental effect is "a substantial, or potentially substantial,
adverse change in the environment."  (Pub. Resources Code,
§ 21068.)  "A project has a significant effect on the environment
if, among other things, it substantially reduces the habitat of a
fish or wildlife species, causes a fish or wildlife population to drop
below self-sustaining levels, threatens to eliminate a plant or
animal community, or reduces the number or restricts the range
of an endangered, rare, or threatened species."  (*Endangered
Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th
777, 792 (*Endangered Habitats League*); see Guidelines, § 15065,
subd. (a)(1).)

Our review of a lead agency's compliance with CEQA is the
same after denial of a petition for writ mandate as on appeal
from the grant of a petition for writ of mandate:  We determine
"'whether there was a prejudicial abuse of discretion'" (Pub.
Resources Code, § 21168.5), which is established "'if the agency
has not proceeded in a manner required by law or if the
determination or decision is not supported by substantial
evidence.'"  (*Vineyard, supra,* 40 Cal.4th at p. 426.)  Our "proper
role in reviewing a challenged EIR is not to determine whether
the EIR's ultimate conclusions are correct," but merely "whether
the EIR is sufficient as an informational document" and whether
its conclusions are supported by substantial evidence.  (*Laurel*

79

*Heights, supra,* 47 Cal.3d at p. 407.) "Substantial evidence" is defined in the Guidelines as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) We review claims of inadequate discussion de novo, unless the agency's discussion of significant project impacts implicates a factual question. (See *Sierra Club, supra,* 6 Cal.5th at pp. 513-514.)

In examining an EIR under these standards, we "look[] not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151; *Laurel Heights, supra,* 47 Cal.3d at p. 406; accord, *Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 514; *PCL, supra,* 180 Cal.App.4th at p. 242.) Our role on review "'is not to decide whether [the agency] acted wisely or unwisely, but simply to determine whether the EIR contained sufficient information about a proposed project, the site and surrounding area and the projected environmental impacts arising as a result of the proposed project or activity to allow for an informed decision . . . .'" (*PCL,* at p. 242.) "A court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." (*Laurel Heights,* at p. 393; accord, *Ebbetts Pass, supra,* 43 Cal.4th at p. 944.)

B.    *The EIR Adequately Analyzed Wildlife Connectivity Impacts*

The Center argues the EIR violated CEQA by failing to discuss adequately and/or to mitigate the project's impacts on

80

wildlife connectivity.[24]  (See Guidelines, § 15126.2, subd. (a).)
The Center argues the EIR's discussion was inadequate as a
matter of law because it failed to:  (1) disclose the Centennial
project's significant impacts on regional wildlife connectivity,
including the "Tehachapi Linkage" corridor that allows wildlife
movement among area mountain ranges and open space;
(2) properly describe the project site's importance to wildlife
movement; (3) disclose the project's significant impacts on
mountain lion populations; and (4) adopt or require mitigation
measures.  In particular, the Center argues the EIR fails to
discuss adequately the impacts on wildlife movement arising
from the expansion of SR-138.  Tejon, joined by the County,
argues the EIR fully disclosed, analyzed, and mitigated impacts
on wildlife connectivity.  We agree and conclude the EIR's
discussion of the impacts on wildlife connectivity was sufficiently
adequate to serve the EIR's purpose as an informational
document.[25]

EIR section 5.7 addressed environmental impacts on
biological resources, including wildlife and plants.  The EIR
adopted Threshold 7-4 (from the County Environmental
Checklist) to analyze impacts on local and regional wildlife
movement.  Under Threshold 7-4, a project has a significant
impact if it would "[i]nterfere substantially with the movement of
any native resident or migratory fish or wildlife species or with

---

[24]     Wildlife connectivity, as discussed in the EIR, refers to the
ease of wildlife movement between open space areas.

[25]     Because the Center did not raise a substantial evidence
challenge on wildlife connectivity, we analyze the adequacy of the
discussion de novo.  (See *Sierra Club, supra,* 6 Cal.5th at pp. 514-
516.)

81

established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites."  The EIR explained that "the statement 'interferes substantially with the movement of any native resident or migratory fish or wildlife species' . . . refers to blockages, barriers, or other substantial impediments to animal dispersal between large, regional open spaces."

The EIR discussed local and regional wildlife movement over more than a dozen pages in sections 5.7.3 and 5.7.6, with reference to numerous different wildlife studies.  The EIR identified the Tehachapi Mountains northwest of the project site as an important "regional landscape linkage" between the Sierra Nevada, Coast Ranges, and San Gabriel Mountains, used by wildlife as a corridor between similar habitats (the Tehachapi Linkage).  The EIR described the dangers to wildlife of "fragmentation of open spaces resulting from urbanization" and the significance of Tejon Ranch's open spaces for species movement, with "the breadth of the [Tehachapi] mountain range" lying within Tejon Ranch.  It stated that "keeping the Tehachapi linkage functional is important for the long-term viability of many species and for the overall health of the plant and wildlife communities in the region."  The EIR also explained the Tehachapi Linkage is located "just to the west of the Project [and] the Project lands have generally not been included as part of this regional corridor."  Wildlife movement studies relied on in the EIR "have generally shown the Project area as a whole to be largely outside the critical regional corridor" of the Tehachapi Linkage.

In discussing wildlife movement on the project site specifically, the EIR acknowledged that "individual animals move

on and off the site and travel significant portions of it; this discussion also recognizes that some species may cross significant portions of or the entire site on occasion." The EIR noted that larger mammals such as mountain lions "frequent the foothills above the Project site and are expected to occasionally forage at lower elevations, including within the Project site." The EIR reported the project site overall is an unsuitable habitat for mountain lions because it contains very little cover, provides very little water, and is not ideal for mountain lion prey. It further stated the project would remove some of their foraging habitat. Mountain lion tracks were observed on the project site north of SR-138. As a "high mobility ground-dwelling" species, mountain lions "require large home ranges" and rely on landscape linkages for population dispersal. The local mountain lion population suffers from low genetic diversity and risk of extinction due to lack of connectivity with other populations, making the survival of individual migrating lions of "immediate conservation importance." The EIR stated the project could indirectly "affect dispersal events" by species such as mountain lions, "resulting in reduced genetic diversity."

The EIR, nevertheless, concluded the project site as a whole did not provide "crucial linkages for imperiled terrestrial animals and avian species." The EIR concluded that "lack of vegetation cover and the presence of significant existing barriers to wildlife dispersal [such as the California Aqueduct and I-5] combine to make the Project site an area of limited opportunity for regional wildlife movement." The EIR acknowledged that SR-138 is a "major movement deterrent[] in the Project area" and "is expected to become a more formidable barrier" for larger and "medium to high mobility species" traveling along the western portion of the

83

project site from the Tehachapi Mountains to the Angeles National Forest. But it explained that the expansion of SR-138 "is expected to occur regardless of the Project."[26] As such, the EIR explained that: "Project development is not expected to interfere with a majority of regional wildlife movement (1) based on the findings of independent studies that the Project site is largely outside the regional wildlife movement corridor; (2) since the site's feasibility to be utilized as part of a regional wildlife corridor between the Tehachapi Mountains (to the north) and the Angeles National Forest (to the south and west) is limited by the Aqueduct and I-5; and (3) because the majority of the site is open grassland and does not support the forest and shrub cover that many larger, wide-ranging species tend to use during movement episodes."

The EIR ultimately concluded the project's direct impacts on local and regional wildlife movement would be "less than significant." The EIR further concluded that while the project "may have substantial indirect impacts on wildlife movement adjacent to the site[,] . . . areas further north and northwest in the Tehachapi Mountains would not likely be impacted. . . . [T]he

---

[26] The EIR explained in a different section that "SR-138 runs in a general east-west direction through the southern section of the site and is a currently a two-lane highway, but the California Department of Transportation (Caltrans) is proposing to widen and realign SR-138 into a four- to six-lane highway through and near the site, as part of its comprehensive Northwest 138 Corridor Improvement Project. As such, the Project anticipates and would complement the planned SR-138 improvements, as intended by the West EOA." The EIR also states that although SR-138 passes through the project site, it is itself "not part of the Project site nor within the Project boundaries."

core area of this linkage zone is several miles to the northwest of the Project site.  As a result, the Project's indirect impacts are not expected to reach the primary regional linkage area, and regional connectivity is expected to be minimally impacted."  The EIR stated the impacts on wildlife movement and general wildlife habitat from the project would be reduced to less than significant with mitigation measures (MM 7-14 through MM 7-18), and that the "most likely north-south passage across or in the vicinity of the Project site (on the western edge of the site and adjacent areas)" would be retained as open space.

The EIR considered commentary from the California Department of Fish and Wildlife (CDFW) and the Santa Monica Mountain Conservancy (SMMC), among others.  The CDFW recommended additional wildlife surveys.  The California Department of Transportation (Caltrans) commented that "[d]evelopment in this area may affect the wildlife corridor crossing of SR-138 and mitigation measures should be planned for."  And SMMC stated "the proposed project . . . would sever the most optimal five-mile-wide habitat linkage across Highway 138 between 15 and State Route 14.  The DEIR is massively flawed for totally failing to analyze the project's potential impacts on habitat connectivity from the Tehachapi Mountains south (across Highway 138) into the portion of the Angeles National Forest located just east of 15. . . .  [T]he proposed project . . . would eliminate virtually all wildlife movement across Highway 138 within the project boundary.  Not even the slightest contiguous band of habitat or open land is proposed from the northern project area to Highway 138 or the proposed project open space south of Highway 138."  The County responded to SMMC that "the majority of the Project site only abuts SR-138, with solely

85

the southeastern portion of the site including areas both to the north and south of the roadway." The County affirmed its conclusion that development of the project "would not significantly impact movement" between the Tehachapi and San Gabriel Mountains, and it noted that MM 7-14 designates an SR-138 wildlife underpass that would provide some wildlife movement, as would an additional SR-138 underpass to be constructed further to the east consistent with the Antelope Valley Area Plan.

The superior court ruled the EIR's discussion of impacts on wildlife connectivity was adequate as a matter of law, with "sufficient detail to enable those who did not participate in its preparation to understand and to consider meaningfully the issues the proposed project raises," citing *Sierra Club, supra,* 6 Cal.5th at page 510. We agree. The EIR disclosed and described the importance of the Tehachapi Linkage, documented the project site's features and potential impacts relative to wildlife movement, including mountain lions, and noted the bases for its conclusions in independent studies. The EIR described the expansion of SR-138 and acknowledged its impacts on wildlife movement, but it explained this expansion was expected regardless of the Centennial project and would be mitigated in part by the SR-138 wildlife undercrossing described in MM 7-14 and an additional SR-138 undercrossing to the east.

That other agencies such as SMMC and CDFW opined the project would result in significant impacts on wildlife connectivity due to expansion of SR-138, as the Center argues, or recommended additional studies, does not mean the EIR's wildlife connectivity analysis or discussion was inadequate or inaccurate. (Cf. *North Coast Rivers Alliance v. Marin Municipal*

*Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 643 (*North Coast*) ["'evidence of a disagreement with other agencies is not enough'" to show lack of support for CEQA findings].)  An EIR "must lay out any competing views put forward by the lead agency and other interested agencies," but "[it] is an informational document, not a settlement agreement or a memorandum of understanding.  The lead agency may disagree with the opinions of other agencies." (*Banning Ranch, supra,* 2 Cal.5th at p. 940.)  In short, the EIR did not fail to provide an accurate and informed discussion of the project's impacts on the Tehachapi Linkage and the site's importance to and impacts on wildlife movement, including mountain lions.  It was an adequate informational document.  (*Sierra Club, supra,* 6 Cal.5th at p. 519.)

The Center further argues the EIR failed to consider meaningfully and to adopt feasible measures to mitigate impacts on wildlife movement, such as installing wildlife crossings on adjacent highways or considering alternative project designs, and failed to proceed as required by law in rejecting other agencies' mitigation recommendations.  Since we conclude the EIR's discussion, which determined there were no significant impacts, was adequate as a matter of law, we need not address the Center's argument that the EIR failed to require mitigation measures to address the impacts.  Further, that other agencies recommended additional mitigation measures also does not mean the EIR's mitigation discussion was inadequate as a matter of law.  (Cf. *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626 [disagreement with other agencies regarding mitigation measures does not show EIR is inadequate]; *North Coast*, *supra*, 216 Cal.App.4th at p. 643.)

C.    *Native Perennial Grasslands and Wildflower Fields*

The Center argues the EIR violated CEQA by failing to discuss adequately or to mitigate impacts on native perennial grasslands and wildflower fields.  (See Guidelines, § 15126.2, subd. (a).)  The Center contends the EIR's discussion was inadequate as a matter of law because it (1) failed to quantify the loss of native perennial grassland attributable to the project; (2) failed to separately disclose significant impacts on wildflower fields; and (3) impermissibly deferred mitigation for native perennial grasslands, wildflower fields, and rare plant species.  Tejon, joined by the County, argues the EIR adequately disclosed and mitigated the project's impacts.

We are not persuaded the County failed to proceed in the manner required by CEQA or that its determinations were unsupported by substantial evidence.  The EIR's discussion and assessment of the project's expected impacts and mitigation measures is adequate as an informational document as a matter of law.  We further conclude the EIR's finding that impacts on grasslands and wildflower fields would be less than significant with mitigation was also supported by substantial evidence.

1.    *The EIR's Discussion of Native Perennial Grasslands and Wildflower Fields Impacts Was Adequate*

The EIR addressed impacts on native perennial grasslands and wildflower fields (as a seasonal "component of grasslands") in sections 5.7.3 and 5.7.6.  The EIR adopted Threshold 7-2 to analyze impacts on native perennial grasslands and wildflower fields, which it took from the County Environmental Checklist.  Under Threshold 7-2, a project has a significant impact if it would "[h]ave a substantial adverse effect on any sensitive

88

natural communities . . . identified in local or regional plans, policies, regulations or by CDFW or USFWS."

Native perennial grasslands and wildflower fields are considered "special status" vegetation types by the CDFW. The EIR reflected numerous biological surveys and vegetation mapping of the Centennial project site, including field studies to determine the distribution and composition of grasslands on site and off site conducted in 2003, 2004, 2006, and 2011. Over 9,100 existing acres of "Native Perennial Grassland/California Annual Grassland" were identified on the project site and on project-impacted off-site areas. The EIR concluded "[m]ost of these grassland areas would be directly impacted by implementation of the Project."

The EIR described in detail the composition of the grasslands characteristic of the site. It stated that "[t]here is no official operational definition of 'native perennial grassland'" and that the grasslands on site were "a mix of native perennial grassland and California annual grassland (with associated wildflower fields)," with increased native perennial grass species occurring on ridge tops as well as in a "mosaic" with annual grassland species. Using predictive modeling, the County determined the "highest quality" native perennial grassland and native flowering plant communities were found on the southern slopes area north of the project site, where several mitigation preserve areas are currently located.

As to the project's effects on wildflower fields, the EIR explained that "[w]ildflower fields occur throughout grasslands on the site," with over 71 wildflower species represented. Specifically, the EIR reported "botanical studies conducted over several years have shown that [wildflower fields] are seasonal

and intermixed with other native and non-native grassland species." The mosaic of native perennial grasslands and California annual grassland "include(s) intermixed, seasonal wildflower fields that vary in density from year to year. Wildflower fields are a component of the grasslands that are temporarily visible depending chiefly on rainfall amounts and timing."

The EIR does not differentiate between native perennial grasslands and California annual grasslands and the impacts on each type, nor does it separately quantify wildflower fields within the grasslands. The EIR explained: "Although areas of wildflower fields have been observed and are known to occur, this component of the grassland vegetation type was not mapped due to its ephemeral nature and high variability between years depending on weather patterns. Based on field observations and data collected during grassland studies, in general, varying densities of wildflower fields occur amidst the grassland vegetation throughout the site." The EIR stated that attempts at modeling spatial distribution of wildflower fields was unsuccessful due to the "drastic variability" year to year based on precipitation.

The EIR determined that "the loss of thousands of acres of grassland at least potentially containing a native perennial component (a special status vegetation type) is significant. Loss of wildflower fields, considered to be a subset vegetation type within the grasslands, is similarly considered a significant impact due to their rarity and status as a special status vegetation type."

But the EIR further concluded that implementation of MM 7-10, requiring 2:1 preservation of a similarly mixed

90

community of grasslands "on open space lands on the Project site and on other lands within Tejon Ranch," would reduce the impacts to less than significant levels. Based on the "infeasibility" of distinguishing between native perennial grasslands and California annual grasslands, MM 7-10 requires Tejon to mitigate all grasslands impacted by the Centennial project by preserving similar grasslands in the area in perpetuity, at a 2:1 ratio. "Mitigation lands for impacts to biological resources would consist of approximately 3,861 acres of unimpacted/[significant ecological area] lands on the site and 23,547 acres with additional off-site areas." MM 7-10 provides: "[M]itigation for loss of those areas modeled as native perennial grassland will provide similar habitat quality as that which was lost. The result shall be native perennial grassland and wildflower field values that are equal to or greater than the overall ecological functions and values of those lost as a result of Project implementation."

According to the Center, the lack of specificity regarding the extent of native perennial grasslands and wildflower fields "precludes informed decision making" on impacts and mitigation. The Center contends that "without an estimated quantification of wildflower field extent, the EIR mitigation measure MM 7-10 cannot assure the preservation of wildflower fields in the conserved grasslands." The superior court concluded the EIR presented "a good faith effort at full disclosure" regarding the environmental impacts and mitigation efforts on native perennial grasslands and wildflower fields. It further determined the EIR's finding that impacts on grasslands and wildflower fields would be less than significant through mitigation was supported by substantial evidence. We agree.

91

The EIR's discussion reflects the County used "'its best efforts to find out and disclose all that it reasonably can' (Guidelines, § 15144), and that the EIR display[s] 'adequacy, completeness, and a good faith effort at full disclosure' (Guidelines, § 15151)." (*PCL, supra,* 180 Cal.App.4th at p. 253.) Substantial evidence from the underlying field studies supports the conclusions that grasslands on the project site and impacted off-site areas are a "mosaic" of native perennial grasses and annual grasses, with more substantial coverage of native perennial grassland on the southern slopes north of the site. The "ephemeral" nature of wildflower fields is also supported by substantial evidence of highly variable occurrences of wildflower cover depending on seasonal precipitation. The scientific literature on wildflower fields is cited and referred to throughout the relevant EIR sections, not solely "'buried in an appendix'" as the Center contends.

Relatedly, substantial evidence supports the conclusion the mitigation measures would effectively mitigate impacts on native perennial grasslands and wildflower fields. The EIR requires Tejon to provide mitigation by protecting grasslands that are similar to those impacted by the project, as informed by "focused surveys of mitigation lands" and efforts to "further create or enhance plantings." And "[v]ast" wildflower fields have been documented in offsite preserve areas.[27] In short, the EIR's

---

[27] The Center contends the EIR "double counts" land previously conserved in 2010 under conservation easements with the State. Tejon correctly notes that while two of the designated preserve areas are indeed already subject to conservation easements, those lands "may still be enhanced and restored to create biological value." The EIR states, "these lands are not

conclusions are supported by substantial evidence and the EIR is sufficient as an informational document. (See *Laurel Heights, supra,* 47 Cal.3d at p. 407.) The EIR contained "'sufficient information about a proposed project, the site and surrounding area and the projected environmental impacts arising as a result of the proposed project or activity to allow for an informed decision'" regarding native perennial grasslands and wildflower fields. (*PCL, supra,* 180 Cal.App.4th at p. 242.)

2. *The EIR Did Not Impermissibly Defer Mitigation*

The Center contends the County impermissibly deferred the mitigation measures for native perennial grasslands and wildflower fields. "An EIR may not defer the formulation of mitigation measures to a future time." (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 280.) "'Impermissible deferral of mitigation measures occurs when an EIR puts off analysis or orders a report without either setting standards or demonstrating how the impact can be mitigated in the manner described in the EIR.'" (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 236.)

The Center argues MM 7-1 defers "the formulation of both specific procedures *and* performance criteria, and the evaluation of their likely efficacy." MM 7-1 requires that, before disturbing an area impacting sensitive plant species, Tejon must prepare and implement a "Special Status Plant Species Restoration Plan" that meets specific criteria in order to achieve the designated

eligible for passive mitigation credit; however, these lands are eligible mitigation lands for enhancement, restoration, and creation of biological values" and that MM 7-1 has been revised to clarify this restriction.

performance standard of a 2:1 mitigation ratio. The Center argues this plan has not yet been prepared and MM 7-1 explicitly defers the adoption of these "success criteria" until a future time. The Center further argues MM 7-1 improperly "defers surveys to confirm the presence or absence of rare plant species on proposed mitigation lands until after Project approval." Finally, the Center argues that channeling "Native Perennial Grassland and Wildflower Field Mitigation" (MM 7-10) through the Ranchwide Management Plan (RWMP) is "opaque" and "speculative."

We conclude the EIR did not impermissibly defer mitigation. "'[A]n agency goes too far when it simply requires a project applicant to obtain a biological report and then comply with any recommendations that may be made in the report." (*Endangered Habitats League, supra,* 131 Cal.App.4th at p. 793.) But "'[d]eferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan.'" (*Ibid.*; see Guidelines, § 15126.4.) Here, the County did so. At the time of project approval but before implementation had begun, "mitigation [was] feasible but impractical." (*Endangered Habitats League,* at p. 793.) The restoration plan also had to be in place before the environmentally sensitive areas could be disturbed, thus, "it [was] sufficient to articulate specific performance criteria and make further approvals contingent on finding a way to meet them." (*Ibid.*)

D.    *Alternatives to the Centennial Project*
Finally, the Center argues the EIR failed to analyze any alternatives that would substantially lessen the project's adverse

94

impacts, setting up an "all or nothing" decision for the County that deprived the County and the public of an informed choice. First, the Center contends the EIR's failure to consider any alternative with a "meaningfully smaller" development footprint than the proposed Centennial project unreasonably deprived the public and decisionmakers of sufficient information to make an informed choice. The Center also contends the inclusion of a larger, previously proposed project as an alternative was misleading. The County argues, joined by Tejon, that the EIR's alternatives analysis complies with CEQA and considered a reasonable range of alternatives. We conclude the EIR adequately addressed alternatives to the project.

1.     *Governing Law and Standard of Review*

One of an EIR's primary functions "'is to ensure that *all reasonable alternatives* to proposed projects are thoroughly assessed" by the lead agency. (*Goleta Valley, supra*, 52 Cal.3d at p. 565.) "'The lead agency is responsible for selecting a range of potential alternatives for examination and must publicly disclose its reasoning for selecting those alternatives.' (Guidelines, § 15126.6, subd. (a).)" (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 741 (*Tiburon*); see Pub. Resources Code, § 21001, subd. (g).) Agencies "should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects." (Pub. Resources Code, § 21002.)

"An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid

95

or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (Guidelines, § 15126.6, subd. (a); see *id.*, § 15126.6, subd. (c); Pub. Resources Code, § 21002.) "An EIR need not consider every conceivable alternative to a project. Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation. An EIR is not required to consider alternatives which are infeasible." (Guidelines, § 15126.6, subd. (a).) The key is whether the "range of alternatives discussed fosters informed decisionmaking and public participation." (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 354 (*Cherry Valley*).) "A 'feasible' alternative is one that could accomplish 'most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects.'" (*Tiburon, supra,* 78 Cal.App.5th at p. 741.)

"There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (Guidelines, § 15126.6, subd. (a); accord, *Goleta Valley, supra,* 52 Cal.3d at p. 576 [lead agency has discretion to determine how many alternatives constitute a reasonable range].) "A court will uphold the selection of project alternatives unless the challenger demonstrates "'that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives."'" (*Golden Door, supra,* 50 Cal.App.5th at p. 546.)

"We review whether the EIR's alternatives analysis complies with CEQA's procedural mandates and then decide whether substantial evidence supports the decisions made. [Citation.] Plaintiffs must show that the alternatives 'are manifestly unreasonable and that they do not contribute to a

96

reasonable range of alternatives.'" (*Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 703.) Here, because "the focus of this contention is whether the analysis was reasonable and not whether it occurred, the contention presents a predominantly factual question and our review is for substantial evidence." (*Cleveland, supra,* 17 Cal.App.5th at p. 435.)

2.  *The EIR Adequately Analyzed Alternatives to the Project*

The Centennial project as initially proposed in 2003 had a substantially larger development footprint than the project as currently proposed. As detailed in the EIR, "the Project now proposes 3,665 fewer dwelling units and approximately 4.12 million square feet (msf) less of commercial and business park development, on a development footprint that is approximately 640 acres less than the earlier proposed project." Development was also eliminated from dense woodland areas and sensitive canyons, among other adjustments. These reductions and design changes were implemented over several years "in response to concerns from the County, other agencies, and members of the public over potential impacts."

The current project also now conforms to the 2015 Antelope Valley Area Plan (AVAP) for future growth and development, which designates three Economic Opportunity Areas (EOAs) for higher development densities while limiting development in rural preserve areas. The AVAP projects regional growth to a total of 106,180 dwelling units; 405,410 residents; and 134,351 jobs in unincorporated Antelope Valley.

The EIR ultimately evaluated six alternatives to the Centennial project. These included: (A) no project; (B) the previously proposed version of the project with a larger development footprint; (C) a project with additional drainage avoidance, that "reduce[d] the development footprint by approximately 37 acres"; (D) a project with infrastructure relocation; (E) a project with density clustering; and (F) a central employment opportunity area development. Alternative C would preserve the additional 37 acres as open space, reduce residential units to 19,241 (from 19,333), and reduce commercial space by 200,000 square feet. Alternative E would disturb 656 fewer acres and reduce environmental impacts. The EIR stated: "Because the proposed Project was substantially reduced compared to the previously proposed project (Alternative B) in both development footprint and land use intensity to avoid and/or reduce environmental impacts, further consideration of a reduced development scenario (e.g., reduced grading footprint; reduced dwelling units; reduced nonresidential square footage) was not considered reasonable. The current Project design is consistent with the Los Angeles County General Plan 2035 and the AVAP . . . . [¶] Any reduction in the proposed unit count or in the amount of non-residential development that would be large enough to reduce a potentially significant environmental impact would also result in a development proposal that is not consistent with the goals and policies of the AVAP related to development within the West EOA, or supportive of the Project's objectives. Thus, alternative development scenarios were eliminated from further analysis in this EIR."

The County's CEQA Findings also stated: "Given the well documented need for Antelope Valley employment and housing

98

opportunities in order to accommodate projected population growth, and the comparatively minor environmental benefits of Alternative C as compared to the Project, the Board [] hereby rejects Alternative C as infeasible after taking into consideration County employment and housing policy and the fact that Alternative C would provide fewer employment and housing opportunities for all income levels as compared to the Project. . . . [Alternative C]'s reduction of housing and job opportunities is inconsistent with the AVAP 'Rural Preservation Strategy' to direct needed housing and job growth to designated Economic Opportunity Areas (EOAs) in order to preserve the rural character of the Antelope Valley outside of EOAS."

The Center contends the EIR was inadequate because it failed to consider a "meaningfully reduced development footprint alternative" beyond the alternatives that were included. The Center argues "the EIR cites nothing in the AVAP that mandates that a very large, 12,323-acre version of Centennial go forward, nor does it provide evidence that a smaller version of the Project would be infeasible." The Center also argues that Alternative C, which would reduce the project by 37 acres, provides only "a less than one percent reduction of the Project footprint that does not meaningfully address the Project's impacts that correlate to its enormous size." The Center argues that such minor environmental benefits do not "substantially lessen" the project's impacts pursuant to Public Resources Code section 21002, and that the EIR should have analyzed a "significantly downsized" project.

We conclude the EIR considered a "reasonable range of potentially feasible alternatives" (Guidelines, § 15126.6, subd. (a)) and reasonably declined to consider alternatives with

99

an even further reduced footprint. The Center is correct that the alternatives considered provide de minimis reductions in the footprint and size of the development in light of the Centennial project's overall size. But this does not mean a significantly reduced alternative must necessarily be considered, particularly given the significant reductions already made to the proposed project, which the EIR notes has been "in the public eye" since 2003. "The 'rule of reason' requires an EIR 'to set forth only those alternatives necessary to permit a reasoned choice.'" (*Tiburon, supra,* 78 Cal.App.5th at p. 741; Guidelines, § 15126.6, subd. (f).) And, "[a] 'feasible' alternative is one that could accomplish 'most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects.' (Guidelines, § 15126.6, subd. (a).)" (*Tiburon*, at p. 741.)

Here, the original proposed development (Alternative B) was already reduced to the current development footprint over many years of scrutiny and public participation. Where a project goes through the CEQA review process and is scaled back to decrease its environmental impacts, it is reasonable that, where further decreasing the size and scope of the project would no longer serve the goals of the region's housing plan, the EIR does not need to continue to make significant changes to the scope of the project as an alternative. The "'key issue' is whether the range of alternatives discussed fosters informed decisionmaking and public participation" (*Cherry Valley, supra,* 190 Cal.App.4th at p. 354), and under the circumstances here the range of alternatives did so and was reasonable.

Additionally, as the EIR and the superior court noted, the AVAP seeks to meet the need for employment and housing opportunities by promoting development in the region where the

100

Centennial project is located (in the West EOA) while preserving rural space elsewhere.  Accordingly, the County concluded even the modestly reduced housing and job opportunities provided by Alternative C were inconsistent with these goals under the AVAP.  Reliance on the goals of the AVAP is a reasoned choice that discloses the "analytic route the . . . agency traveled from evidence to action" in its analysis of alternatives and decision not to consider any smaller alternative plan.  (*Laurel Heights*, *supra*, 47 Cal.3d at p. 404.)  Comprehensive land-use plans like the AVAP "embody fundamental policy decisions that guide future growth and development" and "necessarily compel[] cities and counties to consider *alternative* land-use goals, policies and implementation measures." (*Goleta Valley, supra,* 52 Cal.3d at p. 571.)  Indeed, the AVAP itself constitutes substantial evidence supporting this conclusion, and failure to consider an even further reduced development footprint was not ""manifestly unreasonable."" (*Cherry Valley, supra,* 190 Cal.App.4th at 355.)  Project EIRs are "not ordinarily an occasion for the reconsideration or overhaul of fundamental land-use policy." (*Goleta Valley,* at p. 573.)

The Center has not demonstrated the alternatives analyzed in the EIR were insufficient to foster informed decisionmaking, and substantial evidence supports the County's decision to issue the final EIR without considering other additional alternatives. (See *Inyo Citizens for Better Planning v. Inyo County Bd. of Supervisors* (2009) 180 Cal.App.4th 1, 14.)  We conclude the "range of alternatives discussed fosters informed decisionmaking and public participation." (*Cherry Valley, supra,* 190 Cal.App.4th at p. 354.)

## DISPOSITION

The judgment of the superior court is affirmed.  The parties are to bear their own costs on appeal.


MARTINEZ, P. J.

We concur:


FEUER, J.


STONE, J.